**CITIZENS FOR CLEAN AIR and Council for Land Care and Planning, Petitioners,**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and Washington Department of Ecology, Respondents,**

**City of Spokane, and Wheelabrator Spokane, Intervenors.**

**No. 90–70119.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 9, 1990. Decided March 26, 1992.

David A. Bricklin, Bricklin & Gendler, Seattle, Wash., for petitioners.

Craig D. Galli, U.S. Dept. of Justice, Washington, D.C., for respondent.

Jeffrey B. Renton, Gregory B. Foote, E.P.A., Office of General Counsel, and Deborah Hilsman, Asst. Regional Counsel, EPA Region X, for E.P.A.

Laurie S. Halvorson, Asst. Atty. Gen., Olympia, Wash. (Washington Dept. of Ecology) (appeared only).

Craig S. Trueblood, Preston, Thorgrimson, Shidler, Gates & Ellis, Spokane, Wash., for intervenors-respondents, City of Spokane.

Before: TANG, O'SCANNLAIN and LEAVY, Circuit Judges.

TANG, Circuit Judge:

Citizens for Clean Air and the Council for Land Care and Planning ("Citizens") petition for judicial review of final orders of the Environmental Protection Agency ("EPA") denying Citizens' two petitions for administrative review. Citizens sought EPA review of a Washington Department of Ecology ("Ecology") permit for construction of a solid waste incinerator by the City of Spokane, Washington. The Clean Air Act, as amended, 42 U.S.C. §§ 7401–7671q, sets standards for the issuance of permits by state agencies such as Ecology. Citizens alleges that it was arbitrary and capricious for EPA to uphold the permit issued to Spokane. Citizens argues that EPA and Ecology failed to consider recycling as a "best available control technology" for air pollution as required by the

Act. We deny Citizens' petition for judicial review.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Planning Stage*

In the early 1980s, Spokane began grappling with a shortage of safe landfill sites for city and county refuse. Contamination of the Spokane–Rathdrum aquifer forced the closure of three landfills, later designated as EPA "Superfund" sites. In 1981, Spokane initiated studies of landfill alternatives, including a mass burn incinerator which would convert refuse to marketable energy (a "waste-to-energy" incinerator). By 1984, after several more studies and public hearings, Spokane adopted a comprehensive plan for solid waste management.[1] The comprehensive plan included plans for recycling, waste reduction, a waste-to-energy incinerator, and, as a last resort, a new regional landfill. The recycling program increased the Spokane County recycling rate from 5% of all waste produced in 1984 to 19% in 1990. The 1990 update of the comprehensive plan sets a recycling goal of 50% by 1995.

The incinerator aspect of the plan also proceeded. First, Spokane completed environmental impact statements required under Washington law. Next, in 1987, Spokane contracted with Wheelabrator Environmental Systems ("Wheelabrator") to design and build a waste-to-energy incinerator.[2] Spokane also contracted with a power utility to buy the energy produced. Finally, in 1987, Spokane initiated the permitting process under the Clean Air Act.

### B. *The Clean Air Act Permitting Stage*

#### 1. Statutory Framework

The Clean Air Act includes a scheme for the "prevention of significant deterioration of air quality," called the "PSD" program. *See* 42 U.S.C. §§ 7470–7492. The PSD pro-

gram requires owners and operators to secure a permit before construction of certain new stationary sources of air pollution. *Id.* § 7475. Spokane's proposed incinerator qualifies as a new source of air pollution regulated under the PSD program.

Three features of the PSD program figure in this review of EPA decisions. First, all such new sources must meet "New Source Performance Standards," which impose various emissions limitations. *Id.* § 7411(a), (f). EPA periodically promulgates New Source Performance Standards under its rulemaking authority. *Id.* § 7411(b)(1)(B). Second, the PSD program requires all new source applicants such as Spokane to install the "best available control technology" ("BACT") to reduce air pollution. *Id.* § 7475(a)(4). Determination of the best available control technology is made "on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs." *Id.* § 7479(3). Third, EPA regulations for the PSD program require notice, a comment period, and a public hearing on applications for new sources of air pollution. *See* 40 C.F.R. §§ 124.10–124.12. Upon final approval of an application by a state agency, participants in the comment process may petition the EPA Administrator in Washington, D.C. for administrative review. *Id.* § 124.19.

#### 2. Spokane's Permit Application

Pursuant to 40 C.F.R. §§ 52.21(u), 52.-2497(b), EPA has delegated administration of the PSD program in Washington to Ecology. On August 26, 1987, Spokane filed its PSD permit application with Ecology. Spokane proposed an incinerator designed to burn 800 tons of solid waste per day. The proposal included no provision for removal of recyclable materials from the "waste stream" except for refrigerators and hazardous materials. The incinerator design instead included combustion and "in the

---

**1.** *See* "1984 Spokane County Comprehensive Solid Waste Management Plan Update," adopted pursuant to Washington State Solid Waste Management Act, Wash.Rev.Code ch. 70.95.

**2.** Wheelabrator is an intervenor-respondent in this appeal.

stack" technologies[3] to reduce regulated air pollutants. Even with these technologies installed, Spokane's proposed incinerator will emit hundreds of tons of regulated pollutants into the air each year.

During the comment period on Spokane's application, Citizens challenged the proposed PSD permit because the proposal failed to include recycling as a "best available control technology" to reduce air pollution. Citizens noted that recycling would reduce the volume of the waste stream and thereby necessarily reduce air pollution generated by burning waste. Citizens further commented that recycling qualified as the best available control technology when "taking into account," as the Act requires, "energy, environmental, and economic impacts and other costs." 42 U.S.C. § 7479(3). Citizens argued that recycling would minimize

> costs uniquely associated with mass burn incineration including revenue lost from recyclable materials; energy costs associated with manufacturing from virgin, as opposed to recycled[,] materials; environmental and other costs due to the mining of raw materials when recycled materials could be used instead; costs associated with disposal and handling of hazardous incinerator ash; soil, water, and plant contamination caused both by air pollution and by leachate from ash disposal sites; and cumulative effects such as acid rain and ozone depletion.

In support of its comments, Citizens filed three studies of recycling.

Ecology responded to Citizens' comments by rejecting consideration of recycling as a best available control technology for the Spokane incinerator. On December 13, 1988, Ecology issued final approval of the Spokane incinerator permit.

### C. *The Administrative Appeals*

#### 1. Spokane I: The First Appeal

In December 1988, Citizens appealed Ecology's approval of the Spokane incinerator to the EPA Administrator. Citizens argued that Ecology had erred in failing to consider recycling as a best available control technology. As a result, Citizens argued, Ecology planned to permit the incinerator to discharge more regulated pollutants than necessary. Further, Citizens challenged Ecology's failure to require "deNOx" control technologies to reduce nitrogen oxide emissions from the incinerator.

On June 9, 1989, the Administrator issued an order denying review of the Spokane permit. *In re Spokane Regional Waste-to-Energy Applicant*, PSD Appeal No. 88–12 (EPA June 9, 1989) (*"Spokane I"*). The Administrator ruled that Citizens had failed to meet its burden on administrative appeal. That is, Citizens had failed to show Ecology had "committed clear error" in refusing to consider recycling as a best available control technology. *Id.* at 21. The Administrator also dismissed as moot Citizens' argument concerning deNOx control technologies because Spokane agreed to install the requisite technology. *Id.* at 23. The Administrator thus remanded the permit to Ecology to set new pollutant levels recalculated for deNOx technologies. *Id.* The Administrator "strictly limited" the scope of any future appeal to those revised pollutant levels. *Id.* at 24.

#### 2. Recycling as a New Source Performance Standard

A month prior to Spokane's 1987 permit application, EPA published notice of proposed new rules for New Source Performance Standards for municipal waste combustors ("MWCs") such as Spokane's. 52 Fed.Reg. 25,399 (1987). The notice mentioned recycling as a proposed New Source Performance Standard. *Id.* On December 20, 1989, six months after the Administrator's order denying Citizens' appeal of the Spokane incinerator permit and while that permit was on remand to Ecology, EPA published the proposed New Source Performance Standards. 54 Fed.Reg. 52,251 (1989). In its proposed rule, EPA observed that as a matter of common sense recycling

---

**3.** "In the stack" technologies include scrubbers inside the emission stack, for example.

is an appropriate technology for reduction of air pollution from incinerators. *Id.* at 52,281. EPA also noted that it was "unable to reliably quantify the emission reductions attributable to materials separation when an MWC is equipped with highly efficient at-the-stack air pollution control devices." *Id.* The Administrator approved the draft New Source Performance Standards, and opened them for public comment. When Citizens petitioned for review in this court, final approval of recycling as a New Source Performance Standard was still pending.[4]

### 3. Spokane II: The Second Appeal

In September 1989, after an additional public comments period, Ecology issued revised final approval of Spokane's incinerator permit. Citizens petitioned the Administrator for review of the revised permit. In its petition, Citizens argued that the revised NOx emissions limit was still too high because it did not account for reductions that would result from "a more vigorous waste reduction and recycling program." In support of its petition, Citizens cited the draft New Source Performance Standard for recycling for municipal incinerators recently approved by the Administrator. The petition also included a study of Seattle's successful recycling program.

On January 2, 1990, the Administrator denied Citizens' petition. *In re Spokane Regional Waste-to-Energy Project*, PSD Appeal No. 89–4 (EPA Jan. 2, 1990) ("*Spokane II*"). The Administrator again ruled that Citizens had failed to meet its burden on administrative appeal. *Id.* at 2–3. The Administrator further held that Citizens had improperly tried to raise the same recycling issue the Administrator had foreclosed in the prior denial. *Id.* at 4. On March 8, 1990, Citizens petitioned this court for review of the Administrator's *Spokane I* and *Spokane II* orders.

**4.** Since submission of the case to this court, EPA has rejected recycling as a New Source Performance Standard. *See* 56 Fed.Reg. 5,488, 5,496–98 (1991). Referring to the instant case, however, EPA noted that "whether an emission reduction requirement based on source separa-

## STANDARD OF REVIEW

 The Administrative Procedure Act governs judicial review of EPA decisions. Accordingly, we may set aside the decision permitting the Spokane incinerator only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *accord Citizens Against the Refinery's Effects, Inc. v. United States EPA*, 643 F.2d 178, 181 (4th Cir.1981); *see also Northern Plains Resource Council v. United States EPA*, 645 F.2d 1349, 1358 (9th Cir.1981) ("EPA is obligated to articulate a rational connection between the facts found and the choice made") (quotation omitted). In reviewing the Administrator's interpretation of the Clean Air Act, we "must reject administrative constructions which are contrary to clear congressional intent." *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). If, however, we determine that the Clean Air Act is "silent or ambiguous with respect to the specific issue," we determine only whether the Administrator's "answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782; *see also Utility Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 442 (9th Cir.1989). Deference also guides our review of the Administrator's interpretation of EPA regulations if the interpretation is not unreasonable. *See Lambert v. FDIC*, 847 F.2d 604, 606 (9th Cir.1988).

## DISCUSSION

### A. *The Spokane I Order*

Citizens contends that the Administrator erred by holding Citizens had failed to meet an "especially heavy" burden of providing "hard data" in support of recycling as a best available control technology for the Spokane incinerator. *Spokane I* at 13–14. Citizens argues that, by improperly imposing this burden, the Administrator changed

tion [recycling] is appropriate for a specific incinerator project may continue to be raised on a case-by-case basis in individual BACT [best available control technologies] determinations." *Id.* at 5,496 n. 4.

the rules of administrative review without notice, prevented Citizens from complying with the new rules, and shifted the burden of advancing new air pollution control technologies from PSD applicants to public intervenors.

The PSD permit procedure imposes different burdens on different parties at various stages of the process. Initially, the burden rests with the PSD applicant to identify the best available control technology. Relying on EPA "guidance" memoranda, the Administrator concluded that "the statutory definition of BACT [best available control technology] imposes a responsibility on the permit applicant to identify the particular 'available' technology that will produce the maximum degree of reduction of each regulated pollutant to be emitted from the proposed facility." *Spokane I* at 8 (emphasis omitted); *see also* 42 U.S.C. § 7475(a)(3) (placing responsibility on the applicant to demonstrate that emissions from the proposed new source will not cause excessive air pollution). Specifically, the applicant is expected to employ a "top-down" methodology to identify the best available control technology. *Spokane I* at 9.

■ Under the top-down methodology, applicants must apply the best available control technology unless they can demonstrate that the technology is technically or economically infeasible. *Id.* The top-down approach places the burden of proof on " 'the *applicant* to justify why the proposed source is unable to apply the best technology available.' " *Id.* (quoting EPA "guidance" memorandum) (emphasis added). The burden of identifying and applying the best available control technology thus lay with Spokane during the proceedings before Ecology.

■ Once the permitting process reaches the public comments stage, "[a]ll persons, including [permit] applicants, who believe ... the ... tentative decision to ... prepare a draft permit is inappropriate, must raise all reasonably ascertainable issues and submit all reasonably available arguments supporting their position." 40 C.F.R. § 124.13. The permitting authority

is then obligated to respond to "all significant comments." *Id.* § 124.17(a)(2). As the Administrator recognized in this case, *Spokane I* at 12–13, " 'comments must be *significant* enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern. The comment cannot merely state that a particular mistake was made...; it must show why the mistake was of possible significance in the results.' " *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978) (quoting *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 394 (D.C.Cir.1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974)) (emphasis added).

Upon initial approval of a permit, any person who filed comments may petition the Administrator for review of the permit decision on any ground, so long as it was raised to the extent required during the public comment period. 40 C.F.R. § 124.-19(a). In petitioning the Administrator for review of a PSD permit, the burden shifts from applicants to petitioners such as Citizens. Under EPA regulations, in order to obtain administrative review petitioners must show that approval of the permit was based on:

> (1) A finding of fact or conclusion of law which is clearly erroneous, or
>
> (2) An exercise of discretion or an important policy consideration which the Administrator should, in his or her discretion, review.

*Id.* Petition for administrative review of a permit decision, then, is not a matter of right. Indeed, as the Administrator emphasized, EPA has determined that the " 'power of review should be only sparingly exercised,' and 'most permit conditions should be finally determined at the Regional [State] level.' " *Spokane I* at 3 (quoting preamble to review regulation, 45 Fed.Reg. 33,412 (1980)).

Once the case reaches this court, we apply the arbitrary or capricious standard set forth above to the agency action approving the PSD permit. Contrary to EPA's argument, we do not simply review

whether it was arbitrary or capricious for the Administrator to reject Citizens' claims that Ecology clearly erred. Rather, we conduct a deferential review of the entire agency action, including the adequacy of Ecology's response to Citizens' comments. *See* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."); *see also id.* §§ 706 (providing for judicial review of "agency action"), 551(13) (defining "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"), 701(b)(2) (incorporating section 551 definition of "agency action" into APA judicial review provisions).

With these varying standards and levels of review in mind, the issue ultimately presented to this court is whether EPA's response to Citizens' comments concerning recycling was arbitrary or capricious. We think this issue turns on whether the agency properly relied on the "significant comment" threshold test set forth at 40 C.F.R. § 124.17(a)(2) in refusing to consider recycling as a possible best available control technology.

■ In taking this approach, we reject Citizens' argument that, instead of relying on the § 124.17 threshold test, EPA imposed a *new* "heavy burden" requiring Citizens to produce "hard data" concerning recycling before EPA could be required to consider recycling as a possible best available control technology. Citizens bases its argument here on the fact that Ecology responded to Citizens' comments, and that § 124.17 only requires a response when comments are "significant." Citizens therefore concludes that its comments must be significant, such that EPA must have employed a different, new test in or-

der to avoid further consideration of recycling.

We disagree. Citizens' argument fails to take into account that the burden of proof at the permitting stage rested upon the permit applicant, not EPA. So long as EPA declines to require a response *from the applicant*, and otherwise does not substantively respond to a comment, we surmise that EPA has not considered the comment to be significant. It is this determination that we must review.[5]

### 1. Sufficiency of Citizens' Comments

Anticipating our approach, Citizens contends that the Administrator erred in holding that Citizens' comments on Spokane's PSD application were not sufficiently significant to require Ecology either to request a response from the permit applicant or otherwise to consider recycling as a possible best available control technology. It is "incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Vermont Yankee*, 435 U.S. at 553, 98 S.Ct. at 1216. Citizens contends that their comments to Ecology about recycling met this standard.

■ In considering Citizens' administrative petitions, the Administrator noted that, because the permit applicant bears the burden of identifying the best available control technology, the slightest suggestion by an intervenor in the comments might compel applicants to undertake time-consuming, costly studies. *Spokane I* at 12. Deploring this scenario, the Administrator emphasized that applicants and agencies need respond in detail only to " *'significant* comments.' " *Id.* (emphasis added by Administrator) (quoting 40 C.F.R. § 124.17(a)(2)). Citing the *Vermont Yankee* Court, the Administrator noted that "petitioners' responsibility to present its position and conten-

---

5. "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Northern Plains Resource Council*, 645 F.2d at 1358 (citations and quotation omitted); *accord California Energy Comm'n v.*

*Bonneville Power Admin.*, 909 F.2d 1298, 1314 (9th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1682, 114 L.Ed.2d 77 (1991). As will appear, we think the path we find the agency to have taken is reasonably discernible, and so we proceed to review whether, in taking this path, the agency has gone out of bounds.

tions effectively was especially heavy" when asking an applicant or agency to " 'embark upon an exploration of uncharted territory.' " *Id.* at 13–14 (quoting *Vermont Yankee,* 435 U.S. at 553, 98 S.Ct. at 1216). Finding that recycling as an air pollution control was such "uncharted territory," the Administrator held that Citizens failed to meet its burden to show Ecology clearly erred in failing to evaluate recycling in detail despite Citizens' comments. We agree with the Administrator's reading of the *Vermont Yankee* decision.

In light of Citizens' comments and *Vermont Yankee,* EPA's decision not to consider recycling as a possible best available control technology was not arbitrary or capricious. Citizens does not assert that at the time it originally filed its comments with Ecology, hard data existed concerning the effects of fuel cleaning and separation used in combination with state-of-the-art cleaning devices. Rather, it is undisputed that *no* such hard data existed. In considering Citizens' comments, Ecology stated that the technology needed further study in order to quantify its benefits, and even after the Spokane PSD permit had been issued, a 1989 EPA Municipal Waste Task Force Report concluded that "data are currently inadequate to determine precisely the effect on air emissions and ash of eliminating specific materials from the waste stream prior to combustion." Citizens does not contest these statements.

Although Citizens has structured its comments so as to be more specific than were those in *Vermont Yankee,* Citizens offers no hard evidence of the effectiveness of fuel cleaning and separation in combination with scrubbers and baghouses. Nor does Citizens refer to analogous technology that would quantifiably validate the effectiveness, or even the use, of fuel cleaning and separation in combination with state-of-the-art technologies. Instead,

Citizens contends its comments are sufficient to provoke consideration of recycling as a possible best available control technology on the common sense argument of "burn less, pollute less."

Taken by itself, "burn less, pollute less" is of course a common sense approach. However, once the addition of state-of-the-art control technologies are introduced into the equation, this common sense statement can no longer stand on its own two feet. As the Administrator indicated, because Spokane's proposed incinerator will incorporate state-of-the-art pollution control technologies, recycling may not result in a "demonstrable reduction in emissions of regulated pollutants." *Spokane I* at 22. Thus, Citizens was required to introduce something more specific. In particular, it appears EPA considered necessary some indication of what materials recycling would remove from the waste stream, and what regulated air pollutants would thereby be further diminished after existing control technologies have been taken into account. Here, Citizens did not set forth with specificity, if at all, either issues or evidence in support of its common sense argument.

As the Administrator concluded, the three studies submitted by Citizens are not relevant to the question whether fuel cleaning and separation in combination with conventional, state-of-the-art pollution control equipment is best available control technology for the Spokane incinerator.[6] *Spokane I* at 15–17. One of the studies compared emissions from incinerators lacking air pollution controls to those from the same uncontrolled incinerators with the addition of recycling. *Id.* at 15. The Administrator reasoned that "it is *impossible* to conclude" from this study whether recycling would have decreased emissions further had the test incinerators also employed the state-of-the-art technologies pro-

**6.** The three studies are "A Non–Incineration Alternative Approach to Solid Waste Management Using Recycling Based Strategies for the Town of Oyster Bay, New York," June 1988 ("Oyster Bay" study); Letter dated May 25, 1988, from David P. Howekamp, Director, Air Management Division, EPA Region IX, to Larry Richardson, North County Resource Recovery Associates, with attachments ("San Marcos" study); National Recovery Technologies, Inc., "Effects of MSW Preprocessing on Thermal Conversion of MSW in Mass Burn Incineration," May 31, 1985 ("NRT" study).

posed for the Spokane incinerator. *Id.* at 15–16. Another study determined that recycling was not the best available control technology for the facility in San Marcos, California. *Id.* at 16–17. Thus, none of the studies supported the proposition that a recycling requirement for Spokane's incinerator would reduce emissions of regulated pollutants over and above the reductions Spokane will achieve by installing the other technologies already required by the PSD permit. *Id.* at 17. We find nothing arbitrary or capricious in the Administrator's analysis of these studies.

In light of the statutory requisite that the proposed technology be the *best available* control technology, and in the absence of anything specific or quantifiable in support of a position that common sense alone cannot sustain, we conclude that EPA's decision not to consider recycling in permitting the Spokane incinerator was not arbitrary or capricious.

### 2. Construction of the Statutory Term "Best Available Control Technology"

■ Citizens also contends that, in requiring it to demonstrate quantitatively the effects of recycling in combination with pollution control technology, the Administrator erred in construing the term "available," as used in the statutory phrase "best available control technology," to mean "quantifiably effective." Citizens points out that the Clean Water Act requires new sources of pollution to employ the "best available *demonstrated* control technology." 33 U.S.C. § 1316(a)(1) (emphasis added). Congress did not require "demonstrated" effectiveness under the Clean Air Act, however. Instead, Citizens argues, a technology is "available" under the Clean Air Act so long as it is not "purely theoretical or experimental." *See Portland Cement Ass'n*, 486 F.2d at 391 (quotation omitted). The Administrator erred, Citizens concludes, in denying Citizens' petition for lack of data quantifying recycling as a best available control technology for Spokane's incinerator. Obviously, Citizens argues, recycling is neither purely theoretical nor experimental.

Even if we were to agree that the Administrator erred in construing the statutory term "available" to mean "quantifiably effective," the error did not prejudice Citizens. As Citizens concedes, a technology's effectiveness must be considered at some point to determine whether it is the "best" technology. The Administrator's rationale applies with equal force to a "best" as well as to an "available" determination. As the Administrator observed, "without the requisite knowledge about the technology's effects on emissions, the technology also cannot be regarded as the 'best' technology." *Spokane I* at 18. Indeed, and as the Administrator further noted, the top-down ranking methodology for best available control technologies requires some kind of quantification of effectiveness in order to rank technologies. *Spokane I* at 9–10. Accordingly, we find no error in the Administrator's application of the term "best"; we have no occasion to rule on EPA's construction of the term "available."

### 3. The New Source Performance Standard for Recycling

■ Citizens argues finally that EPA itself supplied whatever substantiation Citizens' comments may have lacked when the Administrator approved the draft New Source Performance Standard requiring recycling for municipal incinerators such as Spokane's. In approving the new recycling standard, Citizens points out, the Administrator relied on both the "NRT" study[7] and the same common sense inferences rejected by the Administrator in denying Citizens' first petition. If the NRT study and common sense suffice for the proposal of nationwide, mandatory standards, Citizens argues, they ought to suffice to require Ecology and EPA to consider recycling as a possible best available control technology.

In the order denying Citizens' second petition, the Administrator explained three reasons for refusing to consider the pro-

7. *See supra* note 6.

posed new recycling standard in support of Citizens' petition. *Spokane II* at 5 n. 3. First, the new standard was still in draft form, susceptible to public comment and change. *Id.* Second, if finally adopted, the standard would apply to Spokane's incinerator in all events. *Id.*[8] *Third, the evidence supporting the new standard did not appear in the record for Spokane's PSD permit either before Ecology or before the Administrator in the first petition. Id.* In the "interest of repose," therefore, the Administrator declined to review the evidence at that stage. *Id.*

Citizens deftly attempts to undermine the Administrator's rationale. If the issue is persuasiveness of the evidence to EPA itself, Citizens argues, lack of final approval does not weaken the Administrator's imprimatur on the evidence shown by his initial approval of the draft recycling standard. Citizens adduced the exact same evidence in its comments as EPA considered in proposing the new recycling standard; i.e., the NRT study and "common sense." The NRT study and common sense arguments were on the record both before Ecology during the permit process and before the Administrator in Citizens' first petition. Thus, Citizens concludes, the Administrator acted arbitrarily and capriciously by rejecting, on the one hand, Citizens' recycling evidence in support of its petition and, on the other hand, adopting the exact same evidence in support of the draft recycling standard for all new municipal incinerators.

Data supporting a New Source Performance Standard, however, must necessarily be more generalized than data supporting a best available control technology determination for a particular incinerator in a particular place. Indeed, we have previously distinguished New Source Performance Standard or "NSPS" determinations from those made under the PSD program. In *Northern Plains Resource Council,* we explained:

> While the NSPS program and the PSD are both interrelated parts of a compre-

hensive federal legislative effort to protect and enhance this nation's air quality, the two programs play different roles in achieving that broad general goal....

> The focus of the NSPS program ... is upon the "affected facility" component in a stationary source, *i.e.* the particular *apparatus* to which a standard is applied. The NSPS program is therefore equipment oriented. On the other hand, the PSD program covers the whole stationary source, and focuses on where the plant will be located and its potential effect on its environs. The PSD program is therefore site oriented.

645 F.2d at 1355–56 (emphasis in original) (citation omitted). We therefore concluded that definitions of statutory terms are not necessarily transferable between the PSD and NSPS programs. *Id.* at 1356. Likewise, the data required for adoption of an "equipment oriented" New Source Performance Standard may fall far short of the data required for the "site oriented" best available control technology determination under the PSD program. Given the distinction between the two programs, the Administrator did not act arbitrarily and capriciously in rejecting Citizens' petition under the PSD program based on data valid for the NSPS program.

### B. *The Spokane II Order*

Citizens also argues that the Administrator erred in refusing to consider Citizens' second petition arguing for recycling as a best available control technology in conjunction with deNOx technology. Citizens points out again that the Administrator's approval of recycling as a draft New Source Performance Standard bolstered their second petition. Moreover, Citizens argues, the Administrator erred in refusing to reconsider recycling in the second petition "in the interest of repose." Congress intended applicants to complete the entire PSD permit process, subject to revision at any time, before commencing construction, Citizens argues. The Administrator's concern for "repose," Citizens argues, thus

---

**8.** After this case was submitted to this court, EPA in fact rejected the recycling New Source

Performance Standard. *See supra* note 4.

thwarts congressional intent that new sources of air pollution incorporate up-to-the-last-minute technologies for emission reduction.

■■■ Citizens correctly describes congressional intent; the Administrator should not have cited "repose" as a rationale for denying Citizens' second petition. *See* 42 U.S.C. § 7475(a)(1); 40 C.F.R. § 124.19(f).[9] However, because we reject Citizens' arguments concerning its first petition, we reject Citizens' objections to the Administrator's *Spokane II* order as well. Citizens offered nothing more specific on remand than it did during the initial comment period. Certainly the proposed recycling standard offers no additional information supporting Citizens' position. As EPA noted in proposing the standard, the agency was "unable to reliably quantify the emission reductions attributable to materials separation." 54 Fed.Reg. 52,251 (1989). The Administrator therefore did not act arbitrarily and capriciously in declining to reconsider recycling as a best available control technology upon Citizens' second petition.

### C. *Attorney Fees*

Citizens requests an award of attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d). We deny the request because we conclude that Citizens does not prevail on this petition for review.

### CONCLUSION

From a broad policy perspective, Citizens makes a good case for consideration of recycling as a best available control technology in PSD permit decisions. Our opinion today by no means weakens that case. Indeed, in denying Citizens' petition, the Administrator affirmed the policy of recycling. "I consider recycling," the Administrator declared, "an essential part of intelligent planning for the solid waste disposal

---

**9.** Section 7475(a) prohibits construction of any facility, including Spokane's incinerator, until a permit has issued which has been subject to public comment on alternatives and to agency review. Regulation 124.19(f) defines final agency action as exhaustion of all administrative remedies, including a petition for EPA administrative review. Citizens is therefore correct that

predicament that more and more of our Nation's cities are facing." *Spokane I* at 4. Citizens' petition for review, however, relies on unpersuasive criticisms of the Administrator's detailed orders denying Citizens' administrative petitions. The petition for judicial review is therefore

DENIED.

an interest in repose would not alone justify the Administrator's refusal to grant a petition for review when, on remand, additional public comments were properly solicited and made.