**Robert L. MORGAN, d/b/a Babco Company, Appellant,**

v.

**NATURAL RESOURCES AND ENVIRONMENTAL PROTECTION CABINET, Appellee.**

**No. 1997–CA–002645–MR.**

Court of Appeals of Kentucky.

Feb. 26, 1999.

Case Ordered Published by Supreme Court Dec. 9, 1999.

Discretionary Review Denied Dec. 9, 1999.

R. Allen Wilson, Owensboro, for Appellee.

Yvette R. Hurt, Frankfort, for Appellee.

BEFORE: BUCKINGHAM, JOHNSON, AND KNOX, JUDGES.

*OPINION*

KNOX, Judge:

This is an appeal from a judgment entered by the Franklin Circuit Court affirming an order of the Secretary of the Natural Resources and Environmental Protection Cabinet (Cabinet) in which appellant was assessed civil penalties for violations of water quality laws and regulations. We affirm.

In 1977, appellant, Robert Morgan, acquired a portion of the working interest in an oil and gas lease on a tract of land located in Daviess County, Kentucky. Included in the lease was one oil well which produced one to one-and-a-half barrels of oil per day, a tank battery, and a holding berm (dike) surrounding the tank. Apparently, the well was not producing any water at the time Morgan acquired the interest. However, at some point between 1984 and 1987, the well began producing water, and Morgan placed a 25-barrel holding tank in the dike to collect the water, known as brine water. Allegedly, Morgan employed a water hauling service on an

occasional basis to empty the tank and dike, and dispose of the water.

On October 14, 1991, an inspector from the Cabinet discovered the brine tank was overflowing into the dike, but was not leaving the dike area. The following day, by way of telephone conversation, the inspector told Morgan to have the overflow hauled away. On October 17, 1991, the Cabinet issued Morgan a notice of violation, alleging that Morgan had violated 401 KAR 5:055 § 1 requiring a permit for the discharge of pollutants into "waters of the Commonwealth." The inspector's report stated, "[d]o not drain brine inside of dike area into natural drainage."

When the inspector returned to the site on November 6, 1991, he again found a slow leak at the top of the holding tank and, further, discovered a garden hose was being used to siphon the brine water from the dike into a natural drainage ditch. The inspector collected a sample of the water at the point where it exited the hose. Lab tests revealed a high level of chloride. Once again, the Cabinet issued a notice of violation under 401 KAR 5:055 § 1. Shortly thereafter, Morgan ceased the production of oil at the site.

The Cabinet filed an administrative complaint against Morgan on September 28, 1993. The complaint not only alleged violations of 401 KAR 5:055 § 1, but further alleged that Morgan had also violated KRS 224.70–110, 401 KAR 5:065, and 401 KAR 5:090 for: (1) discharging a pollutant in excess of permit standards promulgated by the Kentucky Pollutant Discharge Elimination System (KPDES); (2) improperly disposing of produced water; and, (3) failing to report the spill of produced water. An evidentiary hearing was held in the matter on April 6, 1994, after which the hearing officer issued his report finding Morgan had violated KRS 224.70–110's general prohibition against discharging pollutants into the waters of the Commonwealth, and had further violated several administrative regulations implemented

pursuant to that statute. Recommended penalties totaled $6500.

The Secretary of the Cabinet adopted the hearing officer's report on December 22, 1995. Morgan appealed the matter to the Franklin Circuit Court which, by order entered September 27, 1997, affirmed the Secretary's order and dismissed Morgan's complaint. This appeal ensued.

As we review the trial court's decision, we are mindful of the limitations placed on the reviewing court, as set out in KRS 13B.150(2):

> The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the final order or it may reverse the final order, in whole or in part, and remand the case for further proceedings if it finds the agency's final order is:
>
> (a) In violation of constitutional or statutory provisions;
>
> (b) In excess of the statutory authority of the agency;
>
> (c) Without support of substantial evidence on the whole record;
>
> (d) Arbitrary, capricious, or characterized by abuse of discretion;
>
> (e) Based on an ex parte communication which substantially prejudiced the rights of any party and likely affected the outcome of the hearing;
>
> (f) Prejudiced by a failure of the person conducting a proceeding to be disqualified pursuant to KRS 13B.040(2); or
>
> (g) Deficient as otherwise provided by law.

## SUBSTANTIAL EVIDENCE TEST

■ In its order, the trial court referenced that portion of *Bourbon County Bd. of Adjustment v. Currans*, Ky., 873 S.W.2d 836 (1994), identifying the proper manner in which to review a decision by a board or agency, i.e. if the claimant is successful before the agency, then the adverse party

appealing the order of the agency must demonstrate the agency's decision was not supported by substantial evidence in the record; if, however, the claimant is unsuccessful and appeals to the trial court, he must show the evidence was so overwhelming, it compelled a decision in his favor. *Id.* at 838. Morgan maintains the trial court's analysis under *Currans* placed the burden on Morgan to produce overwhelming evidence compelling a decision in his favor. We disagree.

The trial court correctly identified the Cabinet, which filed the administrative complaint, as the "claimant." As such, Morgan, as the adverse party appealing the order of the Secretary, had the burden of establishing the order was not supported by substantial evidence in the record. The trial court specifically, and correctly, stated in its judgment that Morgan would be successful on appeal "if he can demonstrate that the Cabinet's decision is not based on substantial evidence or is incorrect as a matter of law." We see nothing in the trial court's opinion indicating any test other than the substantial evidence test was applied. We believe Morgan's argument stems from his mistaken belief that he was the "claimant" in the matter when, in fact, he was not.

Morgan further argues that substantial evidence in the record does not support the hearing officer's findings that he had violated administrative regulations. Substantial evidence has been defined as evidence which "when taken alone or in the light of all the evidence ... has sufficient probative value to induce conviction in the minds of reasonable men." *Kentucky State Racing Comm'n v. Fuller*, Ky., 481 S.W.2d 298, 308 (1972) (citation omitted).

### A. OCTOBER 14, 1991

█ Morgan was found to have violated 401 KAR 5:090 § 5 and § 13 on October 14, 1991. Section 5 states:

Produced Water Disposal. Produced water shall be disposed into an enhanced recovery well, a disposal well permitted under Section 11(3) of this regulation, a well permitted under the 40 CFR 146 underground injection control program ... by a surface discharge permitted under Section 8 of this regulation, by evaporation, by reverse osmosis, or by any other method first approved by the cabinet....

Morgan argues that § 5 allows for on-site disposal of brine water, while § 6, entitled "Disposal of produced water off the facility," addresses off-site disposal. Morgan notes that the inspector specifically instructed him to haul the facility's brine water off-site. Thus, Morgan maintains, § 5's requirements for on-site disposal do not apply to his situation because he disposed of his facility's brine water under § 6, i.e. he had his brine water hauled off-site, just as the inspector ordered. Having complied with the inspector's instructions for off-site disposal, Morgan argues, he cannot be found to have violated § 5's on-site disposal requirements.

Further, Morgan notes the inspection form contained a section wherein the inspector was to indicate whether the produced water at the site is "injected," "hauled," or "discharged." The inspector checked the box marked "hauled." Morgan argues that any of the three means of disposal listed on the form is proper, and that the inspector's acknowledgment that Morgan hauls the brine water off-site is proof positive such a means of disposal is acceptable. Finally, Morgan notes the inspector did not charge him in the Notice of Violation for improper disposal under 401 KAR 5:090 § 5.

Addressing Morgan's arguments, the trial court observed, "it is not the hauling away that is at issue." Rather, the court stated, it is the manner in which the water is disposed of once it leaves the holding tank. The trial court found, based upon the inspector's testimony and the language contained in § 5, that Morgan was not disposing of the brine water, once it overflowed the holding tank, in any acceptable

manner set forth in the regulation, nor had Morgan obtained approval to dispose of the overflow by alternate means, i.e. by way of a dike. Further, the inspector testified that while the dike may have served to contain the overflow of brine water, it was not an acceptable means of disposal. Thus, the court concluded, Morgan violated the disposal requirements of 401 KAR 5:090 § 5.

We agree with the trial court's reasoning. The holding tank was the only authorized means of storage until such time that the water contained therein could be hauled away. We do not believe the dike was yet another acceptable means of "containing" the overflow pending disposal of it. Rather, under Morgan's operation, the dike was essentially the means by which the stored brine water was disposed of.

"Disposal" is defined in KRS 224.01–010(10) as, *inter alia,* the "spilling" of any waste onto land so as to enter the environment. Morgan's stored brine water was literally spilling over from the tank into the dike and, as such, was being "disposed" of in that manner. While the inspector noted on his report that Morgan's dike was satisfactory as a "spill containment," we believe the regulation requires the brine water to be disposed of prior to overflowing any unit in which it may be temporarily stored. Thus, while hauling away the brine water, as Morgan was instructed to do, may very well have been an acceptable means of cleaning out the dike, the fact remains the overflow from the tank was improperly disposed of by way of the dike.

■ The hearing officer found that on October 14, 1991, Morgan also violated 401 KAR 5:090 § 13. Section 13(2)(a) of 401 KAR 5:090 states that "[o]perators shall report to the division all spills and bypasses of oil and produced water from facilities in accordance with 401 KAR 5:015," § 2 of which provides:

> Whenever by reason of emergency or accident a spill or discharge occurs from a sewage system or from a container or pipeline used to transport or store substances which would result in or contribute to the pollution of the waters, the person in charge of such activity shall immediately notify the Division of Water by the most rapid means available.

Morgan argues that because he had no knowledge of the overflow (spill) of brine water into the dike, he was under no duty to report it and, thus, did not violate 401 KAR 5:090 § 13. We disagree.

■ The evidence established that the oil well began producing water sometime between 1984 and 1987, at which point Morgan placed a tank on-site to store the water until it could be disposed of. We believe the regulation charges operators, like Morgan, with the duty of closely monitoring such systems. In this case, the dike itself, approximately twenty (20) feet wide, fifty (50) feet long, and three (3) feet deep, was nearly full. Thus, it would seem that at some point prior to the inspector's discovery of the overflow, this "accidental" spill, as Morgan characterizes it, should have been discovered by either Morgan or his employee, whom Morgan hired to monitor his oil wells.

Morgan testified he had no knowledge of the reporting requirement. The hearing officer did not find this testimony to be credible, given that Morgan had operated as many as fifteen (15) oil wells throughout the years. We agree with the hearing officer's assessment, and believe the evidence supports a finding that Morgan violated the reporting requirements of 401 KAR 5:090 § 13.

### B. NOVEMBER 6, 1991

Morgan was found to have violated the above two regulations yet again on November 6, 1991. For the reasons set forth above, we believe the evidence supports such a finding, and adopt the analysis of the trial court:

> The record makes clear that water had again leaked from the authorized tank into the berm, and that the Cabinet was

not notified. Nor had the Cabinet approved of the storage or disposal in this manner. Thus, without evidence in the record to the contrary, we affirm the Cabinet's findings of these two violations.

■ The hearing officer also found Morgan to have violated 401 KAR 5:055 § 1 and 5:090 § 8, both of which require permits for the "discharge of pollutants from any point source into waters of the Commonwealth." Noting that brine water from the dike area was being discharged from the end of a garden hose, the hearing officer reasoned:

The discharge stream was steady, was traveling down a road for approximately 70 feet and then entered a drainage ditch. The drainage ditch except for this discharge was otherwise dry on this date. Inspector Hagan's testimony. The drainage ditch eventually drains into a blue line stream "Two Mile Creek" which is approximately one half mile away from the facility. Inspector Hagan and Defendant's exhibit # 5. The drainage ditch does carry water during periods of rainfall and thereafter and intermittently constitutes a body of water with defined channels which the Cabinet's witnesses testified makes the discharge into this drainage ditch a discharge into "waters of the Commonwealth" for purposes of the water quality program.

■ Morgan did not dispute the fact that the brine water was being siphoned from the dike into a natural drainage ditch by way of a garden hose. We believe this activity to constitute "discharge" under the regulations:

"Discharge" means any addition of any pollutant or combination of pollutants to waters of the Commonwealth from any point source. This definition includes, but is not limited to, additions of pollutants into waters of the Commonwealth from surface run-off which is collected or channeled by man; discharges through pipes, sewers, or other convey-ances whether publicly or privately owned which do not lead to a treatment works; and discharges through pipes, sewers, or other conveyances leading into privately owned treatment works.

401 KAR 5:050 § 1(13).

Further, Morgan admits never having obtained a permit to discharge his facility's brine water into natural drainage, as is required by the regulations. As such, we believe the evidence supports the finding that Morgan violated 401 KAR 5:055 § 1 and 401 KAR 5:090 § 8.

The evidence established that the chloride level in the water sample taken on November 6, 1991, exceeded the maximum levels allowed under 401 KAR 5:031. As such, the hearing officer found that Morgan further violated 401 KAR 5:090 § 8, which prohibits pollutant levels in surface discharges from exceeding regulatory amounts. Noting that "[t]he KPDES standard for an acute discharge of chloride into a surface water of the Commonwealth for the protection of aquatic habitat is not to exceed 1,200 mg/L," the hearing officer found that lab tests revealed the water contained 2,445 milligrams per liter of chloride. We have reviewed the lab tests, which do, in fact, bear out the findings of the hearing officer. As such, we believe the evidence supports the conclusion that Morgan violated the regulatory criteria governing pollutant levels.

■ Finally, Morgan was found to have violated 401 KAR 5:090 § 6 requiring notification to, and approval by, the Cabinet prior to hauling brine water off-site. There is no evidence in the record establishing that Morgan complied with this requirement. While Morgan argues that the requirements of notice and approval were automatically satisfied when the inspector instructed him to haul the brine water away, we disagree. Section 6 sets out specific information, not within the inspector's knowledge, about which the Cabinet must be notified prior to hauling brine

water off-site. We adopt the trial court's reasoning:

> Petitioner argues that this [telephone] conversation with Hagan constituted notice to the Cabinet that the water was being and in fact was transferred. However, 401 KAR 5:090 § 6 specifically provides that "no person shall authorize or allow the transportation of produced water away from a facility where it is produced unless such operator has first submitted [certain] information to the director and obtained approval." This information includes the quantity of water to be transferred and the name and vehicle identification of the agent removing the water. The Cabinet has no record of this ever occurring and Petitioner did not provide any evidence to the contrary at hearing. Thus there is substantial evidence to conclude that Petitioner is liable for this violation.

We believe the substantial evidence in the record supports the findings and recommendations of the hearing officer and the order of the Secretary adopting the same. We find no error in the trial court's judgment affirming the Secretary.

### CONTRACTUAL RIGHTS

█ Morgan notes that the original lease under which he operated the oil well, executed in 1952, specifically provided for the means of disposal he has used throughout the years, i.e. overflow from the storage tank to be channeled into a dike area. Morgan argues that prohibiting him from exercising his contractual rights under the lease violates § 19 of the Kentucky Constitution prohibiting enactment of "any law impairing the obligation of contracts." Addressing this issue, the hearing officer reasoned:

> Private parties cannot by private contract avoid their duty to follow the requirements of law enacted for the state's legitimate police power such as those enacted for the prevention of water pollution.... The right of contract must yield to the public policy of the Commonwealth as declared by the General Assembly. *Beacon Insurance Company v. State Farm* 795 S.W.2d 62 (Ky.1990)(contract exclusion held invalid under statute). Reasonable exercise of the police power to protect the people and the natural resources of the Commonwealth may constitutionally impact existing contracts. *City of Covington v. Sanitation District No.1*, 301 S.W.2d 885 (Ky.1957).

█ We believe the hearing officer correctly interpreted the law. "A constitutional prohibition against impairing the obligation of contracts ... is not an absolute one to be read with literal exactness. Legislation enacted under police power is not invalid merely because of its incidental effect." *City of Florence v. Owen Elec. Coop., Inc.*, Ky., 832 S.W.2d 876, 881 (1992) (citation omitted).

> [A] state may affect certain prior contracts by subsequent legislation if it has reserved the power to do so by appropriate constitutional or legislative enactments existing at the time the contracts were made. Into the category of reserve power, the courts have read the right to protect the public health or public morals.
>
> The exception which has been many times invoked by the courts, which resembles to some extent the reserve power theory, is found in the principle that the inclusion of existing laws into a contract, at the time it is made, carries with it also the general principle that those relationships defined by the contract are subject to change by subsequent legislation under a reasonable exercise of the state's police power. In this instance, the broad term, police power, is concerned with the public health and the general welfare of the community. The determination of the question of whether the state has properly exercised this power will be decisive of the case at bar.

*City of Covington v. Sanitation Dist. No. 1*, Ky., 301 S.W.2d 885, 888 (1957) (citations omitted). We find that any impair-

ment of the parties' obligations under the 1952 lease, if in fact any impairment exists, results from the legislature's exercise of its power to protect the health and resources of the community.

### "WATERS OF THE COMMONWEALTH"

 The evidence in the record established that the brine water being siphoned out of the dike exited the garden hose, flowed approximately seventy (70) feet down a driveway, and then entered a drainage ditch located one-half mile away from Two Mile Creek. The inspector testified: (1) the ditch is fairly wide, with defined banks; (2) the ditch was dry at the time he inspected Morgan's facility, although he has seen the ditch flowing with surface water after a rain; (3) he has walked the length of the ditch when it was dry, and has personal knowledge that it flows into Two Mile Creek; and, (4) he saw the brine water flowing in the ditch for approximately fifty (50) feet, but did not follow it further to determine whether the flow actually reached Two Mile Creek.

The term, "waters of the Commonwealth," is defined in KRS 224.01–010(33) as "any and all rivers, streams, creeks, lakes, ponds, impounding reservoirs, springs, wells, marshes, and all other bodies of surface or underground water, natural or artificial, situated wholly or partly within or bordering upon the Commonwealth or within its jurisdiction[.]" Morgan argues that his facility's brine water flowed into a dry ditch and, thus, could not have entered any "waters" of the Commonwealth. Further, he argues, because the inspector did not witness the brine water actually flow into Two Mile Creek, Morgan cannot be held responsible for discharge of pollutants into that creek. Finally, Morgan argues there is no proof whatsoever that Two Mile Creek was, in fact, polluted by the facility's brine water, the inspector's having collected no water samples from the creek.

The hearing officer rejected Morgan's argument, which he found was too narrowly drawn and ignored commonly held precepts of hydrology:

Anyone producing a water stream with pollutants, or the potential for pollutants, would simply be able to avoid all water quality standards by simply land applying their produced water, discharging into an intermittent stream during periods of dry weather, or impounding it to prevent a surface discharge at the time regardless of the potential for release into surface waters later or into underground water by seepage into the ground. The statutory provisions should be interpreted to serve the purpose of the legislation.

The hearing officer adopted the reasoning of the Tenth Circuit in *Quivira Mining Co. v. United States EPA*, 765 F.2d 126 (10th Cir.1985), wherein the Clean Water Act was interpreted to regulate the discharge of pollutants into an intermittent gully, dry at the time of discharge, even absent evidence that the pollutants ever actually reached a main stream. It was reasoned that during periods of heavy rainfall, the gully flowed and, thus, had a hydrologic connection to larger bodies of water, rendering the gully "waters of the United States."

The trial court agreed, focusing on the testimony of Peyton Adams, an environmental response team coordinator for the Cabinet's division of water. Adams testified that the ditch in this case serves to "channel" water to Two Mile Creek and, as such, would commonly be considered by the Cabinet as "waters of the Commonwealth." He testified that he would include in that term "any contour hydraulically connected to a stream channel like Two Mile Creek's blue line stream *if* the pool [contour] is in the channel." He stated that he believed the ditch at issue fell into this category.

Ultimately, the trial court deferred to the Cabinet's apparently consistent interpretation that the term "waters of the

Commonwealth" includes a ditch which, even though dry at the time a pollutant is discharged into it, is nonetheless a channel which, when flowing, leads directly to a blue line stream such as Two Mile Creek. Although Morgan argues that such deference on the part of the court constituted clear error, we agree with the court's assessment of the Cabinet's interpretation:

> Agencies are entitled to great deference in interpreting their own statutes and regulations, at least where those interpretations do not contravene the law. *Hagan v. Farris,* Ky., 807 S.W.2d 488 (1991). Here, the Cabinet maintains that it has a policy of including intermittent water sources to be covered by its environmental provisions. We are not prepared to overturn this interpretation without a substantial reason therefor.

The trial court also looked to federal law for assistance, focusing on cases which have interpreted the Clean Water Act, adopted by Kentucky:

> "Waters of the United States" was defined by the court in *United States v. Phelps Dodge Corp.,* 391 F.Supp. 1181 (D.Ariz.1975) to include "normally dry arroyos through which water may flow, where such water will ultimately end up in public waters such as a river or stream, tributary to river or stream, lake, [etc.]." The Tenth Circuit Court of Appeals in *United States v. Texas Pipe Line Co.,* 611 F.2d 345 (1979) held that the Clean Water Act covered the spill of oil into an unnamed tributary of a minor creek, noting that "Congress did not in this Act use the term 'navigable waters' in the traditional sense; Congress intended to extend the coverage of the act as far as permissible under the commerce clause." *Id.* at 347. Finally, the Tenth Circuit has also held that the Clean Water Act included an arroyo which, although not actually navigable, "at times of heavy rainfall, [provides] a surface connection with navigable waters independent of the underground flow." *Quivira Mining Co. v. EPA,* 765 F.2d

126, 129 (1985). The arroyos in these cases bear a striking resemblance to the ditch at issue.

We believe this issue was thoroughly analyzed by both the hearing officer and the trial court. Further, the case law analyzed by the court was pertinent to the issue, and thoughtfully reviewed. We find no error in the trial court's resolution of the matter. We are mindful of KRS Chapter 224's broad prohibition against water pollution, or the threat thereof, and believe the interpretation of both the statute and the regulations in this case serves the purpose of the water quality standards set out in KRS Chapter 224: "to safeguard from pollution the uncontaminated waters of the Commonwealth; to prevent the creation of any new pollution of the waters of the Commonwealth; and to abate any existing pollution." KRS 224.70–100(2).

## POLLUTANT LEVELS

On November 6, 1991, the inspector collected a water sample at the point where the brine water was being discharged from the dike by way of the garden hose. Based upon subsequent laboratory tests and the criteria listed in 401 KAR 5:031, the hearing officer found that the brine water contained an excessive amount of chloride. Morgan argues that the regulations further required the inspector to collect a water sample from Two Mile Creek to determine whether it had been contaminated by the discharge.

Specifically, Morgan points to 401 KAR 5:031 § 4, Table 2, which sets out the maximum "allowable in-stream concentrations" of chloride in a warm water habitat such as Two Mile Creek. Morgan maintains the term "in-stream" refers to a body of water, such as Two Mile Creek, larger than that contained in a ditch. He argues that because the only water sample tested was that taken from the end of the garden hose discharging the brine water, the lab tests cannot possibly establish the discharge actually polluted Two Mile Creek. Further, Morgan argues, even if the ditch could be classified a stream, no sample was

taken from the ditch to determine whether, or to what extent, any chloride present was being diluted as the brine water flowed toward Two Mile Creek.

We find, however, that the inspector's conduct in this case appears consistent with the manner in which the Cabinet routinely tests for pollutants. John Martin, an environmental inspector for the Cabinet's division of water, testified that typically, when a water channel, such as the ditch in this case, is dry, the only sample taken is at the point of discharge. Further, Peyton Adams testified that because there was no water upstream of the ditch to dilute the discharge, the discharge itself is indicative of the amount of chloride entering the ditch. As such, we find no error in the manner or method used to test the brine water discharge.

*JURY TRIAL*

█ Finally, Morgan argues that by way of the administrative procedure established by statute and regulation, especially as concerns the imposition of penalties, he was wrongfully denied his right to a jury trial. We disagree. This issue has been addressed and resolved by our highest court: "Decisionmaking performed by an administrative agency is an executive function. The right to trial by jury does not attach to an executive function. It is protected only within the exercise of judicial power." *Meyers v. Chapman Printing Co.*, Ky., 840 S.W.2d 814, 820 (1992).

For the foregoing reasons, we affirm the order of the Franklin Circuit Court.

ALL CONCUR.