# Illinois Official Reports

## Appellate Court

***Natural Resources Defense Council v. Pollution Control Board*,**
**2015 IL App (4th) 140644**

| | |
|---|---|
| Appellate Court Caption | NATURAL RESOURCES DEFENSE COUNCIL, PRAIRIE RIVERS NETWORK, and SIERRA CLUB, Petitioners, v. THE POLLUTION CONTROL BOARD, a State Agency; THE ENVIRONMENTAL PROTECTION AGENCY, a State Agency; and DYNEGY MIDWEST GENERATION, INC., a Corporation, Respondents. |
| District & No. | Fourth District<br>Docket No. 4-14-0644 |
| Filed | July 22, 2015 |
| Decision Under Review | Petition for review of order of Pollution Control Board. |
| Judgment | Affirmed. |

Counsel on Appeal

Ann Alexander (argued), of Chicago, for petitioner Natural Resources Defense Council.

Albert Ettinger, of Chicago, for petitioner Sierra Club.

Daniel J. Deeb (argued), Amy Antoniolli, and Bina Joshi, all of Schiff Hardin, LLP, of Chicago, for respondent Dynegy Midwest Generation, Inc.

Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, and Timothy M. Maggio (argued), Assistant Attorney General, of counsel), for other respondents.

Panel

JUSTICE TURNER delivered the judgment of the court, with opinion. Presiding Justice Pope and Justice Knecht concurred in the judgment and opinion.

## OPINION

¶ 1   In September 2012, the Illinois Environmental Protection Agency (IEPA) issued a national pollution discharge elimination system (NPDES) permit for discharge of water pollution to respondent Dynegy Midwest Generation, Inc. (Dynegy). In October 2012, petitioners, Natural Resources Defense Council, Prairie Rivers Network, and Sierra Club, filed a petition for review before the Pollution Control Board (Board). In December 2013, petitioners moved for summary judgment. In February 2014, Dynegy and IEPA filed cross-motions for summary judgment. In June 2014, the Board granted petitioners' motion in part, remanding the permit to IEPA with instructions that it be amended to require monthly rather than quarterly monitoring of mercury discharges, but denied the remainder of the motion and granted the cross-motions for summary judgment.

¶ 2   On appeal, petitioners argue the Board (1) erred in holding the IEPA was not required to establish a case-by-case technology-based effluent limitation (TBEL) for discharges associated with Dynegy's facility and (2) failed to enforce IEPA's regulation requiring a response to citizens' comments. We affirm.

### I. BACKGROUND

¶ 4   Dynegy operates the Havana Power Station, "an oil and coal-fired, six-unit steam-electric generating facility" located in Mason County. The Havana facility is located on the east bank of the Illinois River, approximately two miles south of Havana.

¶ 5   In October 2006, Dynegy filed an application for renewal of its NPDES permit (No. IL0001571) for the Havana facility. The permit application disclosed that Dynegy expected to

construct "an activated carbon mercury sorbent injection" (ACI) system. The ACI system is a form of "air pollution control technology that controls mercury emissions into the air." The system cleans a plant's flue gas emissions through the "injection of activated carbon into the flue gas," which absorbs mercury and is later captured by a "particulate removal system." *Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category*, 78 Fed. Reg. 34,432, 34,450 (June 7, 2013) (to be codified at 40 C.F.R. pt. 423) (proposed ELG). Dynegy estimated that after installation of the ACI equipment, the facility would discharge up to 260 tons of fly ash and sorbent residue to the facility's ash pond on a daily basis. Dynegy estimated that up to 2.6 tons of the combined material sent to the ash pond would be mercury-bearing sorbent residue.

¶ 6 The IEPA tentatively found the proposed activities described in the permit application would "result in the attainment of water quality standards *** [and] will benefit the community at large by allowing for the continued operation of the power plant and reduction of mercury and other pollutants in the atmosphere." The IEPA found "[m]ercury that has been removed from air emissions is expected to stay in the sorbent," and the sorbent will then be stored in an ash pond. The IEPA also stated as follows:

> "Between zero and 0.6 pounds of mercury per day is predicted to enter the pond. This is mercury that otherwise would have been deposited in the Illinois River or other water bodies by air deposition. Whatever low levels that are discharged from the ash pond represent a decrease in loading to the environment."

¶ 7 In April 2011, the IEPA issued a draft NPDES permit and sent it to both Dynegy and the United States Environmental Protection Agency (USEPA) for comment. In May 2011, the IEPA issued the draft permit to the public, seeking comments from citizens and interested groups.

¶ 8 In June 2011, Prairie Rivers Network and Sierra Club offered written comments on the draft permit and requested a public hearing. A public hearing was conducted in November 2011. In December 2011, petitioners jointly filed comments with IEPA concerning the draft NPDES permit, arguing, *inter alia*, the IEPA failed to use its best professional judgment to determine the best available technology to control the discharge of mercury or to require Dynegy to submit the information necessary to support such a determination.

¶ 9 The USEPA also responded to IEPA's invitation to comment. USEPA's response letter stated it had reviewed the draft permit and would not object to the issuance of the permit as drafted. The USEPA did, however, recommend five changes, one of which dealt with mercury. The USEPA recommended the IEPA "should accelerate the collection of the mercury data from quarterly to monthly."

¶ 10 In September 2012, the IEPA issued the NPDES renewal permit for the Havana facility. With respect to mercury, the permit retained the quarterly monitoring proposed in the draft but, instead of requiring only 12 samples, required monitoring "throughout the life of the permit." IEPA also issued an NPDES responsiveness summary, addressing comments it had received from the public.

¶ 11 In October 2012, petitioners filed a petition with the Board for review of IEPA's decision to issue the NPDES permit. Petitioners claimed the Clean Water Act (33 U.S.C. §§ 1251 to 1387 (2012)) required that NPDES permits include a TBEL based on the best available technology for toxic pollutants. Petitioners argued the IEPA failed to comply with these requirements and that no TBEL was included in the permit for mercury or any other toxic

- 3 -

pollutants. Petitioners also argued the IEPA's responsiveness summary failed to respond to significant comments.

¶ 12    In December 2013, petitioners filed a motion for summary judgment. In February 2014, Dynegy and the IEPA filed cross-motions for summary judgment.

¶ 13    In June 2014, the Board granted petitioners' motion in part, ordering a change to the permit's schedule for mercury monitoring. The Board rejected petitioners' arguments regarding (1) the need for a mercury TBEL and (2) the comprehensiveness of the responsiveness summary.

¶ 14    The Board recognized that operation of the ACI system will result in an "increased loading of mercury to the ash pond." The Board then stated the main question centered on whether the increased loading would be discharged to the Illinois River. The Board noted two studies that supported "IEPA's conclusion that it is unlikely that there will be an increased loading of mercury on the receiving stream." However, the Board "believe[d] it is imperative that actual monitoring data be used to evaluate the impact of a new waste stream on the receiving unit's effluent quality and the subsequent impact on the receiving stream."

> "In this regard, the Board agrees that IEPA's approach to require monitoring effluent for mercury *** in order to develop data regarding the potential discharge along with the ability to reopen the permit if monitoring indicates water quality concerns. *** Further, the Board finds that the IEPA's approach is consistent with the [Illinois Environmental Protection] Act and Board's regulations. This approach is the only way to have specific data on the effluent mercury concentrations. However, given the potential bioaccumulative impact of mercury on Illinois River, a stream already impaired for mercury, the Board finds that quarterly monitoring would take a longer time period to determine if a permit limit is necessary to insure that the water quality or effluent standards will not be violated. As USEPA recommended, the Board finds that monthly monitoring is more appropriate for characterizing the effluent mercury concentration and evaluating the need for a permit limit."

Thus, the Board ordered the IEPA to amend the permit to provide for monthly monitoring of mercury.

¶ 15    The Board then addressed petitioners' argument that the IEPA was required by the Clean Water Act to develop site-specific TBELs for mercury for the Havana facility based on a best-professional-judgment analysis. The Board reviewed the USEPA effluent limitation guidelines from 1982 (1982 ELG) and found "the plain language of the USEPA definition of 'low level wastes' includes the waste stream from Havana Station's scrubbers and ACI." Thus, the Board found the IEPA was not required to adopt TBELs on a case-by-case basis for the Havana facility.

¶ 16    As to the IEPA's responsiveness summary, the Board declined petitioners' request to review the completeness of the IEPA's response. The Board stated as follows:

> "IEPA adopted its own rules on the content requirements for a Responsiveness Summary. How IEPA implements those rules is IEPA's discretion. Obviously the Responsiveness Summary is a part of the permit appeal record, and as such, the Board would expect that IEPA would provide as complete a document as possible. However, the Board declines to review the Responsiveness Summary for consistency with IEPA's rules."

Following the Board's decision, petitioners timely sought review in this court. See 415 ILCS 5/41(a) (West 2012).

¶ 17                                    II. ANALYSIS

¶ 18                                  A. Standard of Review

¶ 19     In the case *sub judice*, the issues raised present questions of law involving the Board's interpretation of federal and state regulations. When questions of law are involved, our review is *de novo*. *County of Kankakee v. Pollution Control Board*, 396 Ill. App. 3d 1000, 1006, 955 N.E.2d 1, 8 (2009). "However, despite not being bound by an administrative agency's interpretation of the law, a reviewing court should afford substantial deference to the agency's determination of a statute that the agency administers and enforces." *FedEx Ground Package System, Inc. v. Pollution Control Board*, 382 Ill. App. 3d 1013, 1015, 889 N.E.2d 697, 699 (2008).

¶ 20                               B. The IEPA's NPDES Permit

¶ 21     The General Assembly established the IEPA and the independent Board to implement the Environmental Protection Act (415 ILCS 5/1 to 58.17 (West 2012)). *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 107, 866 N.E.2d 227, 230 (2007). The Environmental Protection Act prohibits the discharge of any contaminant into the waters of Illinois without an NPDES permit or in violation of the terms or conditions of the permit. 415 ILCS 5/12(f) (West 2012). The Clean Water Act also prohibits the discharge of any pollutant unless the discharge has been authorized by permit. 33 U.S.C. §§ 1311(a), 1342(a) (2012). In Illinois, the IEPA is the permitting authority responsible for issuing NPDES permits.

¶ 22     The administrator of the USEPA is obligated to establish appropriate "effluent limitations" for each pollutant. 33 U.S.C. § 1311(b) (2012). For toxic pollutants such as mercury, the administrator is required to establish an effluent limitation on an industry-specific basis, applying "the best available technology economically achievable" for that particular industry. 33 U.S.C. § 1311(b)(2)(A), (b)(2)(C) (2012). If the administrator has established such a limitation, it must be used for all permits regardless of whether the permit is issued by the federal government or by a state agency pursuant to a delegation of authority by the USEPA. 33 U.S.C. § 1311(e) (2012); 33 U.S.C. § 1342(a)(1)(A), (b)(1)(A) (2012).

¶ 23     If the administrator has not yet taken all of the "implementing actions" necessary to establish a uniform effluent limitation, then a permit may be issued upon "such conditions as the Administrator determines are necessary to carry out the provisions of" the Clean Water Act. 33 U.S.C. § 1342(a)(1)(B) (2012). To accomplish that goal, the USEPA regulations instruct permit issuers to establish "[t]echnology-based treatment requirements" "[o]n a case-by-case basis under section 402(a)(1) of the [Clean Water] Act [(33 U.S.C. § 1342(a)(1) (2012))], to the extent that EPA-promulgated effluent limitations are inapplicable." 40 C.F.R. § 125.3(c)(2) (2014). USEPA regulations describe this case-by-case process as incorporating a "Best Professional Judgment" standard. 40 C.F.R. § 125.3(a)(2)(i)(B) (2014).

> "In situations where the EPA has not yet promulgated any ELGs for the point source category or subcategory, NPDES permits must incorporate 'such conditions as the Administrator determines are necessary to carry out the provisions of the [Clean

Water] Act.' 33 U.S.C. § 1342(a)(1). [Citation.] In practice, this means that the EPA must determine on a case-by-case basis what effluent limitations represent the [best available technology] level, using its 'best professional judgment.' 40 C.F.R. § 125.3(c)-(d). Individual judgments thus take the place of uniform national guidelines, but the technology-based standard remains the same." *Texas Oil & Gas Ass'n v. United States Environmental Protection Agency*, 161 F.3d 923, 928-29 (5th Cir. 1998).

Permit writers may also use a combination of the two methods. 40 C.F.R. § 125.3(c)(3) (2014). Thus, "[w]here promulgated effluent limitations guidelines only apply to certain aspects of the discharger's operation, or to certain pollutants, other aspects or activities are subject to regulation on a case-by-case basis in order to carry out the provisions of the [Clean Water] Act." 40 C.F.R. § 125.3(c)(3) (2014).

¶ 24    Petitioners argue Illinois law, incorporating provisions of the federal Clean Water Act, requires the IEPA to set permit limits for toxic pollutant discharge on a case-by-case determination of best available technology whenever the USEPA has not promulgated a generally applicable ELG that includes such discharge. In the case of the Havana facility, petitioners contend the IEPA failed to comply with these requirements and that no TBEL was included in the permit for mercury.

¶ 25    Dynegy argues the IEPA was not required to impose best available technology TBELs using its best professional judgment. Dynegy contends the IEPA was not required to impose such TBELs because the 1982 national ELGs imposed by the USEPA apply to the Havana facility. The IEPA and the Board make similar arguments on appeal. Petitioners argue the USEPA's 1982 ELG does not apply to discharges associated with the Havana facility's scrubber/ACI waste stream. Thus, the question at issue is whether the 1982 ELG applies.

¶ 26    In 1982, the USEPA adopted a comprehensive set of rules to regulate discharges from oil-fueled and coal-fueled electricity-generating plants like the Havana facility. The USEPA's regulations cover even the smallest amount of "low volume waste sources," defined as follows:

> "[T]aken collectively as if from one source, wastewater from all sources except those for which specific limitations are otherwise established in this part. Low volume wastes sources include, but are not limited to: wastewaters from wet scrubber air pollution control systems, ion exchange water treatment system, water treatment evaporator blowdown, laboratory and sampling streams, boiler blowdown, floor drains, cooling tower basin cleaning wastes, and recirculating house service water systems. Sanitary and air conditioning wastes are not included." 40 C.F.R. § 423.11(b) (2014).

The plain language of the rule indicates the intent to broadly capture waste streams not specifically regulated elsewhere by the 1982 ELG. Given that the Havana facility's scrubber/ACI waste stream is not specifically regulated elsewhere by the 1982 ELG, the waste stream constitutes a low volume waste source under the language of the rule. Thus, the 1982 ELG applies and the IEPA was not required to adopt TBELs on a case-by-case basis for the Havana facility.

¶ 27    We find support for the conclusion that the 1982 ELG applies to the Havana facility's waste stream in the USEPA's 2010 NPDES Permit Writers' Manual. Chapter 5.2.3.2 states, in part, as follows:

"As noted above, case-by-case TBELs are established in situations where EPA promulgated effluent guidelines are inapplicable. That includes situations such as the following:

* * *

When effluent guidelines are available for the industry category, but no effluent guidelines requirements are available for the pollutant of concern (e.g., a facility is regulated by the effluent guidelines for Pesticide Chemicals [Part 455] but discharges a pesticide that is not regulated by these effluent guidelines). The permit writer should make sure that the pollutant of concern is not already controlled by the effluent guidelines and was not considered by EPA when the Agency developed the effluent guidelines." United States Environmental Protection Agency, *National Pollutant Discharge Elimination System (NPDES) Permit Writers' Manual* ch. 5.2.3.2, at 5-45 to 5-46 (Sept. 2010) (2010 USEPA permit manual).

Thus, the relevant question is whether the USEPA considered mercury–the toxic pollutant at issue here.

¶ 28    The 1982 ELG shows mercury was among the toxic pollutants considered when determining the appropriate effluent limitations for low volume waste sources. See 47 Fed. Reg. 52,290, 52,303 (Nov. 19, 1982) (stating "[t]he following 24 toxic pollutants are excluded from national regulation because they are present in amounts too small to be effectively reduced by technologies known to the Administrator" and listing mercury). As the USEPA considered these pollutants, the 2010 USEPA permit manual directs a permit writer to refrain from imposing best-professional-judgment limitations and instead use the applicable ELG.

¶ 29    We also note the IEPA issued the draft NPDES permit in April 2011 and sent it to the USEPA for comment. In June 2011, the USEPA responded, stating it had reviewed the draft permit and stated it would not object to the issuance of the permit as drafted. The USEPA recommended the IEPA "should accelerate the collection of the mercury data from quarterly to monthly and add a specific reopener." The USEPA also made recommendations with respect to the limitation for total residual chlorine for a waste stream other than the scrubber/ACI waste stream, showing it could demand more from the IEPA. Thus, the USEPA implicitly agreed with the IEPA's decision to not develop and impose a case-by-case best-professional-judgment-based TBEL for the Havana facility scrubber/ACI waste stream.

¶ 30    Although not considered by the Board in making its decision, we find instructive the USEPA's proposed ELG for steam electric power plants. See 78 Fed. Reg. 34,432 (June 7, 2013). In the proposed ELG, the USEPA defined flue gas mercury control (FGMC) wastewater to specifically include wastewater from ACI systems.

"The term flue gas mercury control wastewater means any process wastewater generated from an air pollution control system installed or operated for the purpose of removing mercury from flue gas. This includes fly ash collection systems when the particulate control system follows the injection of sorbents or implementation of other controls to remove mercury from flue gas." 78 Fed. Reg. 34,432, 34,533 (June 7, 2013).

¶ 31    In presenting the proposed ELG's new approach to regulating FGMC wastewater discharges, the USEPA explained those same discharges are "currently included under the

definition of low volume wastes." 78 Fed. Reg. 34,432, 34,463 (June 7, 2013). Thus, it appears the USEPA interprets the 1982 ELG to already regulate ACI discharges as low volume wastes.

¶ 32    USEPA did consider whether to regulate for mercury in low volume waste water, contrary to petitioners' claims and contrary to the finding in *Louisville Gas & Electric Co. v. Kentucky Waterways Alliance*, Nos. 2013-CA-001695-MR, 2013-CA-001742-MR, 2015 WL 3427746 (Ky. Ct. App. May 29, 2015). Moreover, petitioners' reliance on the so-called "Hanlon memo," cited in the *Kentucky Waterways* case, is misplaced, as it does not purport to apply to scrubber or ACI discharges, and thus is not entitled to deference by this court.

¶ 33    All parties agree that, under the Clean Water Act, the IEPA was not required to establish a TBEL for mercury if the USEPA had already established an applicable ELG. Because the Havana facility's scrubber/ACI waste stream was subject to the 1982 ELG, the Board did not err in finding the IEPA was not required to adopt TBELs on a case-by-case basis.

¶ 34                                    C. Citizens' Comments

¶ 35    Petitioners argue the Board erred in declining to enforce IEPA's regulation requiring response to citizens' comments. Petitioners contend that, while the IEPA provided specific responses to citizens' comments concerning other issues raised before the Board, the IEPA said nothing at all concerning case-by-case TBELs. Petitioners argue (1) no legal basis exists for the Board's refusal to enforce IEPA's regulation on posthearing comments and (2) the requirement of a responsiveness summary is mandatory and may not be rendered discretionary by the Board.

¶ 36    In setting forth the requirements of the responsiveness summary, section 166.192 of Title 35 of the Illinois Administrative Code (35 Ill. Adm. Code 166.192, adopted at 11 Ill. Reg. 16550 (eff. Oct. 15, 1987)) states it shall include:

"1) An identification of the public participation activity conducted;

2) Description of the matter on which the public was consulted;

3) An estimate of the number of persons present at the hearing;

4) A summary of all the views, significant comments, criticisms, and suggestions, whether written or oral, submitted at the hearing or during the time the hearing record was open;

5) The Agency's specific response to all significant comments, criticisms, and suggestions; and

6) A statement of Agency action, including when applicable the issuance or denial of the permit or closure plan."

The corresponding federal regulation also requires state agencies to "respond to all significant comments on the draft permit." 40 C.F.R. § 124.17(a)(2) (2014).

¶ 37    " '[C]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern. The comment cannot merely state that a particular mistake was made . . . ; it must show why the mistake was of possible significance in the results ***.' " *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553 (1978) (quoting *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 394 (D.C. Cir. 1973), *cert. denied sub nom. Portland Cement Corp. v. Administrator, Environmental Protection Agency*, 417 U.S. 921

(1974)); see also *Citizens for Clean Air v. United States Environmental Protection Agency*, 959 F.2d 839, 845 (9th Cir. 1992).

¶ 38 The selection of which comments are significant necessarily involves a matter of discretion. A cognizable challenge to an agency's selection decision is not stated unless the challenging party alleges the agency acted in an arbitrary and capricious manner. *Citizens for Clean Air*, 959 F.2d at 845-46.

¶ 39 Here, the IEPA issued the draft permit and sought comments, and petitioners responded. Along with issuing the permit, the IEPA issued a responsiveness summary addressing certain comments. Multiple responses dealt with the issue of mercury.

¶ 40 The applicable regulations require the IEPA to respond to significant comments, criticisms, and suggestions. The regulations do not require a response to all such comments, criticisms, and suggestions. Petitioners have not established their TBEL comments were significant or the IEPA acted in an arbitrary or capricious manner by not selecting those comments for a response or by not providing answers sufficient to satisfy petitioners' concerns. Moreover, the IEPA is entitled to deference in determining whether petitioners' TBEL comments were significant, and the Board did not err in deferring to IEPA's discretion.

¶ 41 III. CONCLUSION

¶ 42 For the reasons stated, we affirm the Board's decision.

¶ 43 Affirmed.