LOUISVILLE GAS AND ELECTRIC
COMPANY, Appellant

v.

KENTUCKY WATERWAYS ALLI-
ANCE; Sierra Club; Valley Watch;
Save the Valley; and Commonwealth
of Kentucky, Energy and Environ-
ment Cabinet, Appellees

and

Commonwealth of Kentucky, Energy
and Environment Cabinet,
Appellant

v.

Kentucky Waterways Alliance; Sierra
Club; Valley Watch; Save the Valley;
and Louisville Gas and Electric Com-
pany, Appellees

2015–SC–000461–DG
2015–SC–000462–DG

Supreme Court of Kentucky.

APRIL 27, 2017

COUNSEL FOR LOUISVILLE GAS AND ELECTRIC COMPANY: Sheryl G. Snyder, Jason Patrick Renzelmann, Frost Brown Todd, LLC, John Clarence Bender, Richard Clayton Larkin, Dinsmore & Shohl, LLP

COUNSEL FOR COMMONWEALTH OF KENTUCKY, ENERGY AND ENVIRONMENT CABINET: Christopher R. Fitzpatrick, Anna Fletcher, Office of General Counsel, Energy and Environment Cabinet

COUNSEL FOR KENTUCKY WATERWAYS ALLIANCE; SIERRA CLUB; VALLEY WATCH; AND SAVE THE VALLEY: Joe Francis Childers, Jr., Joe F. Childers & Associates, Andrea Issod, Nathaniel Shoaff, Greg Wannier, Sierra Club Environmental Law Program

COUNSEL FOR AMICUS CURIAE THE KENTUCKY CHAMBER OF COMMERCE: Brent Robert Baughman, Kelly Dant Bartley, Bingham Greenebaum Doll, LLP

OPINION OF THE COURT BY JUSTICE HUGHES

In April 2010, the Commonwealth of Kentucky, Energy and Environment Cabinet's Division of Water (the Division) issued a permit to the Louisville Gas and Electric Company (LG&E) authorizing it to discharge certain pollutants into the Ohio River in conjunction with the operation of the company's recently expanded electricity generating facility near Bedford, Kentucky, in Trimble County. In subsequent proceedings, the Franklin Circuit Court vacated the permit, and a divided panel of the Court of Appeals affirmed that decision. We granted and consolidated LG&E's and the Cabinet's motions for discretionary review to consider their claims that in vacating the permit the lower courts misapplied controlling federal law. Upon review, we agree that federal law requires a different result, and accordingly we reverse the Court of Appeals' decision and reinstate LG&E's permit.

## RELEVANT FACTS

The facts are not in material dispute. In 1990, LG&E commenced operation of what is referred to as a coal-fired steam electric generation and transmission facility near Bedford in Trimble County. At such a facility the combustion of coal is used to generate steam, which in turn propels electricity generating turbines. The combustion of coal releases gases that bear pollutants, including various compounds of sulfur. Under the federal Clean Air Act, LG&E is required to mitigate its sulfur emissions. It does so by means of a process called "flue gas desulfurization" (FGD) or "wet scrubbing," which involves exposing the sulfur-bearing flue gas to a (usually) lime-containing spray or slurry that captures the sulfur, along with other pollutants, in a waste-water stream.

Illustrating a recurring theme in the struggle to abate pollution, the waste-water stream that solves or mitigates an air-pollution problem becomes in turn a potential source of water pollution implicating the anti-pollution goals and provisions of the Clean Water Act. In 1982, the United States Environmental Protection Agency (EPA) addressed the water pollution concerns raised by steam electric generating facilities and issued a regulation, a Guideline (the 1982 Guideline), imposing limits for such facilities on certain so-called conventional pollutants. The 1982 Guideline acknowledged concerns about a long list of toxic pollutants, but deferred establishing limits for any of them because, according to the Administrator, the technology for effectively reducing the small amounts in which they occurred was not yet sufficiently developed.

Under the 1982 Guideline, most such facilities met the imposed limits, in significant part at least, by storing their various low-volume waste-water streams in settling ponds. There, many of the conventional pollutants would settle out prior to the discharge of the remaining effluent liquid into a body of water, such as the Ohio River. That had long been the method LG&E employed at its Trimble County facility. There, waste-water, including the FGD effluent, was stored temporarily in a gypsum storage basin to allow various solids and non-dissolved metals to settle. The remaining liquid effluent was eventually discharged into the Ohio.

In response to, among other things, public concerns about the toxic pollutants produced during electricity generation, the EPA, by the mid-2000s had begun studying that problem. Its studies confirmed that new regulatory measures were in order, and so in 2009 it began the lengthy process of creating a new Guideline regulation for the steam electricity generating class.[1]

It was in that environment of pending regulatory change that, in 2007, LG&E launched plans to add a second, larger generating unit to its Trimble facility. Soon thereafter it applied to the Division for a revised permit that would accommodate its increased discharges. LG&E's application proposed that it would treat the new unit's FGD effluent in the same manner—gypsum settling pond prior to discharge into the Ohio River—as it had the original unit's FGD effluent under prior permits. During the public comment phase of the permit application process, environmental groups, including the Kentucky Waterways Alliance (KWA), opposed the permit on the ground (among others) that it did not require the removal of certain dissolved (and hence not susceptible to settling) toxic pollutants—in particular

---

1. That process culminated in November 2015 with the promulgation of the revised Guideline (the 2015 Guideline). *See* 80 Fed. Reg. 67,838–01 (Nov. 3, 2015).

mercury, arsenic, and selenium—from the FGD waste-stream prior to its discharge into the river. This particular issue was among the concerns that the EPA itself had acknowledged and was in the process of studying.

When, in April 2010, the Division approved LG&E's application and issued a renewed permit that did not include limits on certain toxic discharges,[2] KWA, along with the Sierra Club's Valley Watch and Save the [Ohio] Valley (collectively KWA or the Alliance), timely petitioned for administrative review before the Cabinet. The Alliance argued that under the federal Clean Water Act, LG&E was required to make use of technologies, currently available, whereby toxic metals, such as those mentioned above, could be removed from the FGD waste water. According to the Alliance, the permit writer's failure to include that requirement rendered the permit invalid.

The Cabinet's hearing officer rejected the Alliance's reading of federal law. In the officer's view, the EPA's 1982 Guideline established what were and what remained the applicable effluent limits for FGD waste-water streams generated by coal-fired steam electric plants. Under that Guideline, according to the hearing officer, the Division was not required to include in LG&E's permit any technology-based limits on the toxic pollutants of concern to the Alliance. By administrative order entered in December 2010, the Cabinet's Secretary adopted the hearing officer's report and recommendation without amendment and thus affirmed the issuance of the permit.

The Alliance thereupon timely filed an appeal from the Secretary's order in the Trimble Circuit Court. LG&E and the Cabinet (Appellants herein), insisting that

Franklin Circuit Court had exclusive jurisdiction to address appeals from final Cabinet rulings, moved for dismissal of the appeal. After much debate between the parties, the Trimble Circuit Court decided (1) that venue rather than jurisdiction was at issue; (2) that under Kentucky Revised Statute (KRS) 224.10–470, the proper venue was Franklin Circuit Court; and (3) that both KRS 452.105, the venue transfer statute, and *Dollar Gen. Stores, Ltd. v. Smith*, 237 S.W.3d 162, 166 (Ky. 2007), made clear that the proper remedy in these circumstances was not dismissal of the Alliance's appeal, but rather transfer of it to the court—Franklin Circuit—where venue would lie.

No sooner had the matter been transferred than LG&E and the Cabinet renewed their objection. Now, although agreeing that Franklin Circuit Court was where the Alliance's appeal should have been commenced, they argued that transfer was not a valid way for the appeal to arrive there. Because in Appellants' view Trimble Circuit Court lacked jurisdiction over the matter, its transfer order was, they insisted, void and so could not provide a legitimate foundation for the exercise of the Franklin Circuit Court's jurisdiction.

Like its Trimble counterpart, the Franklin Circuit Court rejected this contention. It too read KRS 224.10–470 as assigning venue, not exclusive jurisdiction, to Franklin Circuit Court. The opposite reading, it worried, might run afoul of the Kentucky Constitution's Section 109, which establishes "a unified" Circuit Court. The court also observed that, in the circumstances of this case at any rate, the venue/jurisdiction distinction made no real difference, because even if Trimble Circuit had dis-

---

**2.** Prior to the issuance of the LG&E permit, the Division submitted it to the EPA for review. On September 9, 2009, the EPA advised

the Division that it had no objection to the permit.

missed the Alliance's appeal for lack of jurisdiction, the savings statute, KRS 413.270, would have given the Alliance ninety days to refile its appeal in the Franklin Circuit. There seemed little doubt that that—a refiling of the appeal—is precisely what would have happened.

Having thus determined that it was authorized to do so, the circuit court turned to the merits of the Alliance's appeal. It agreed with the Alliance that the absence from the permit of an appropriate technology-based effluent limit for the Alliance's specified toxic pollutants violated mandatory provisions of the Clean Water Act. It acknowledged the 1982 Guideline upon which the Cabinet relied, but in the circuit court's view, that Guideline did not meaningfully address toxic pollutants. It thus brought into play, the circuit court believed, statutory and regulatory provisions meant to guard against "gaps" in the EPA's guideline by requiring permitters who run up against such gaps in the Guidelines to use their "best professional judgment" (BPJ) to supply an appropriate, *albeit* permit-specific, technology-based effluent limit on their own. It also rejected, as not supported by the administrative record, the Cabinet's alternative contention that even if the permit writer were deemed obliged to conduct a BPJ analysis, she had in effect done so in this case. Accordingly, the circuit court vacated LG&E's permit and remanded the matter to the Cabinet for further proceedings.

The Cabinet and LG&E both appealed to the Court of Appeals, and, as noted above, after the two appeals were consolidated, a divided appellate panel affirmed the circuit court's decision. The panel majority agreed with the circuit court as to both the limited scope of the 1982 Guideline and the nature of the permitter's duty to determine an appropriate technology-based effluent limit for toxic pollutants the Guidelines "fail" to address. It also agreed with the circuit court that the permit writer could not be said to have performed an adequate BPJ analysis.

Dissenting, Judge Maze shared his colleagues' concern that the 1982 Guideline for the steam electric power generating class could be left unrevised for some thirty years, long enough for its "guidance" to become more hindrance than means of furthering the Clean Water Act's anti-pollution purposes. Nevertheless, Judge Maze understood the 1982 Guideline as clearly applying to the permit at issue under controlling federal law and thus as precluding the circuit court's and the panel majority's foray into essentially self-help regulation.

We granted the Cabinet's and LG&E's motions for discretionary review to consider their joint claim that the courts below misconstrued the EPA's 1982 Guideline as well as the provisions—both statutory and regulatory—authorizing a permit writer's resort to his or her "best professional judgment" to supply a technology-based effluent limit not provided by the EPA guidelines. That claim is the focus of our analysis, but before we turn our attention in that direction, we must first address Appellants' renewed contention that the case should simply be dismissed because the Franklin Circuit Court's jurisdiction was never properly invoked.

## ANALYSIS

### I. The Jurisdiction of the Franklin Circuit Court Was Adequately Invoked.

In pertinent part, KRS 224.10–470 provides that

(1) Appeals may be taken from all final orders of the Energy and Environment Cabinet. Except as provided in subsec-

tion (3) of this section[3] the appeal shall be taken to the Franklin Circuit Court within thirty (30) days from entry of the final order.

As noted above, the courts below construed this provision as merely a venue statute, *i.e.*, as not pertaining to the authority of the state's individual circuit courts to hear and decide appeals from final Cabinet orders, but providing merely that Franklin County (in essence, the Cabinet's home county) is the proper place to bring such an appeal.

Appellants contend that the statute is jurisdictional and is intended not merely to direct appeals to Franklin County, but actually to divest the state's other circuit courts of their authority to address them. Since the Trimble Circuit Court thus, according to Appellants, had no authority to entertain the Alliance's appeal, it lacked as well the authority to transfer the case to Franklin Circuit. Ignoring that fact, Appellants insist, not only violates the most fundamental limit on the exercise of judicial power, but also runs afoul of the strict compliance with statutory administrative-appeal conditions that this Court has many times held is required of those pursuing administrative appeals.

While we deeply appreciate the seriousness of the questions Appellants raise, we nevertheless do not believe we are compelled in this case to resolve whether KRS 224.10–470 is intended to establish the appropriate venue, or rather to confer jurisdiction, for appeals from Cabinet orders.

Our reluctance stems from the fact that in different circumstances that distinction could work serious consequences, but in this case, as the Franklin Circuit Court noted, it does not. The appeal wound up in the court the statute specifies, and the statutes invoked below, the venue transfer statute and the savings statute, KRS 452.105 and KRS 413.270,[4] make it clear that with respect to appeals, such as the Alliance's, which are timely filed but filed in the wrong court, it is the General Assembly itself, not this Court, that is responsible for relaxing somewhat the rule of strict compliance.

As a final note, furthermore, we would observe that while a court is strictly cabined by its subject matter jurisdiction and may not make substantive rulings where that jurisdiction is lacking, its jurisdiction for other types of preliminary matters is not necessarily so limited. There is no dispute, for example, that regardless of its authority to address and decide the Alliance's appeal, the Trimble Circuit Court had jurisdiction to address Appellants' jurisdictional claims. We need not and do not decide the question, but it is by no means clear, Appellants' purported jurisdictional purity notwithstanding, that that sort of necessary, ancillary administrative authority would not have allowed for the Trimble Circuit Court's transfer order, even if its jurisdiction over the Alliance's appeal were lacking.

For these reasons—the difficulty of the questions and the lack of any genuine need

---

**3.** The parties agree that the subsection (3) exception, which concerns the permitting of "industrial energy facilities," has no application to this case.

**4.** KRS 452.105 provides in its entirety that "[i]n civil actions, when the judge of the court in which the case was filed determines that the court lacks venue to try the case due to an improper venue, the judge, upon motion of a party, shall transfer the case to the court with the proper venue." KRS 413.270 provides in pertinent part as follows: "If an action is commenced in due time and in good faith in any court of this state ... and it is adjudged that the court has no jurisdiction of the action, the plaintiff or his representative may, within ninety (90) days from the time of that judgment, commence a new action in the proper court."

to answer them in this case—we are not persuaded, whatever the meaning of KRS 224.10–470, that the Franklin Circuit Court's assertion of jurisdiction and its refusal to dismiss the Alliance's appeal amounted here either to an abuse of the judicial function or a failure strictly to comply with the General Assembly's intent. Appellants, therefore, are not entitled to relief on their jurisdictional claim, and we turn, accordingly, to their substantive contentions.

## II. The Division of Water Was Not Obliged to Include Technology–Based Effluent Limits For Toxic Pollutants in LG&E's Trimble County Permit.

In furtherance of Congress's objective of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters,"[5] the Federal Water Pollution Control Act, commonly known as the Clean Water Act (CWA or the Act), 86 Stat. 816, as amended, 33 U.S.C. § 1251 *et seq.*, among many other things, outlaws the "discharge of any pollutant" from a "point source" to the "navigable waters" of the United States, except as permitted by the CWA. 33 U.S.C. §§ 1311(a), 1362. In general, the Act limits such discharges to those authorized by a permit, a so-called "National Pollutant Discharge Elimination System" (NPDES) permit. NPDES permits establish enforceable effluent limitations, as well as monitoring and reporting requirements. 33 U.S.C. § 1342. The Act designates the Environmental Protection Agency (EPA) as the issuer of such NPDES permits, 33 U.S.C. § 1342(a), but it provides as well for qualifying States to administer locally their own permit programs. 33 U.S.C. § 1342(b). Since 1983, Kentucky has been a qualifying state under the Act, and, as noted, the Energy and Environment Cabinet's Division of Water administers the KPDES permit program in Kentucky.

Whether issued by the EPA or a qualifying state, the NPDES permit may be individual (issued to a specific entity to discharge pollutants at a specific place) or general (issued to an entire class of dischargers in a geographic location.) *Nat. Res. Def. Council (NRDC) v. U.S. Envtl. Prot. Agency*, 808 F.3d 556, 563 (2nd Cir. 2015) (citing 40 C.F.R. §§ 122.21, 122.28(a)(2), 124.1–21, and 124.51–66). The permit at issue here is an individual one.

Permits can impose two different types of standards on discharges: technology-based standards and standards based on water quality. 33 U.S.C. §§ 1311, 1313, 1342. Prior to 1972, most water pollution control laws, both federal and state, focused primarily on water quality, and water-quality standards remain a fundamental part of the CWA's approach. 33 U.S.C. § 1313. Under the Act, water quality standards are set by states for waters within their boundaries and are then reviewed for approval by EPA. 33 U.S.C. § 1313, 40 C.F.R. §§ 131.4, 131.10–11. EPA must ensure that standards proposed by the states comply with the requirements of the CWA. *NRDC*, 808 F.3d at 563.

A major innovation of the 1972 amendments to the federal Water Pollution Control Act, was the addition to water-quality standards of technology-based standards. These standards, often referred to as "TBELs," "technology based effluent limits," set effluent limits on a point source based on how effectively technology can reduce the pollutant being discharged. *NRDC*, 808 F.3d at 563. The Act requires the EPA to "establish and enforce technology-based limitations on individual discharges into the country's navigable wa-

5. 33 U.S.C. § 1251(a).

ters from point sources." *PUD No. 1 of Jefferson Cty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 704, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994).

Under the Act, EPA *establishes* technology based limitations in Guidelines promulgated as regulations. 33 U.S.C. § 1314. It then *enforces* those limitations through the NPDES permits issued to dischargers. 33 U.S.C. § 1342. Congress designed this system to be "technology-forcing, meaning it should force agencies and permit applicants to adopt technologies that achieve the greatest reductions in pollution." *NRDC*, 808 F.3d at 563–64 (citing *NRDC v. EPA*, 822 F.2d 104, 124 (D.C. Cir. 1987)).

As summarized by the federal Court of Appeals for the Fifth Circuit, the CWA was thus designed to achieve its goals

> through a system of effluent limitations guidelines ("ELGs") and National Pollutant Discharge Elimination System ("NPDES") permits that set technology-based discharge limits for all categories and subcategories of water pollution point sources.... ELGs are the rulemaking device prescribed by the CWA to set national effluent limitations for categories and subcategories of point sources. 33 U.S.C. § 1314(b). An "effluent limitation" is "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into [the nation's waters].... These limitations are technology-based rather than harm-based; that is, they reflect the capabilities of available pollution control technologies to prevent or limit different discharges rather than the impact that those discharges have on the waters.... The CWA prescribes progressively more stringent technological stan-

dards that the EPA must use as a guidepost in setting discharge limits for regulated pollutants. 33 U.S.C. § 1311(b)(1).

*Texas Oil and Gas Ass'n v. EPA*, 161 F.3d 923, 927 (5th Cir. 1998) (footnotes and several citations omitted).

The technological standard long applicable to the setting of discharge limits for regulated toxic pollutants is the so-called "BAT" standard, or "best available technology economically achievable." 33 U.S.C. § 1311, 33 U.S.C. § 1317. Under that standard,

> in promulgating ELGs the EPA must set discharge limits that reflect the amount of pollutant that would be discharged by a point source employing the best available technology that the EPA determines to be economically feasible across the category or subcategory as a whole.

*Texas Oil*, 161 F.3d at 928. The Act specifies several factors the EPA must consider when determining BAT effluent limits. Those factors include

> the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, the cost of achieving such effluent reduction, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate.

33 U.S.C. § 1314(b) (2)(B).

The ELGs, of course, are not self-executing. They become enforceable, achieve their "bite," as is said, "only after they have been incorporated into NPDES permits." *Texas Oil*, 161 F.3d at 928.

NPDES permits are the CWA's implementation mechanism; they are the instrument by which ELGs are made binding on individual dischargers. The

CWA makes it unlawful to discharge any pollutant from any point source without an NPDES permit. 33 U.S.C. § 1311(a) ... These permits must generally incorporate, as a technology-based floor, all applicable ELGs promulgated by the EPA for the pertinent point source category or subcategory. 33 U.S.C. § 1342(a)(1).... In situations where the EPA has not yet promulgated any ELGs for the point source category or subcategory, NPDES permits must incorporate "such conditions as the Administrator determines are necessary to carry out the provisions of the Act." 33 U.S.C. § 1342 (a)(1).... In practice, this means that the EPA must determine on a case-by-case basis what effluent limitations represent the BAT level, using its "best professional judgment." 40 C.F.R. § 125.3(c)–(d). Individual judgments thus take the place of uniform national guidelines, but the technology-based standard remains the same.

*Texas Oil*, 161 F.3d at 928–29 (footnotes and citations omitted).

More particularly, under the heading "Methods of imposing technology-based treatment requirements in permits," EPA's regulations provide as follows:

Technology-based treatment requirements may be imposed through one of the following three methods:

(1) Application of EPA-promulgated effluent limitations developed under section 304 of the Act [33 U.S.C. § 1314] to dischargers by category or subcategory [*i.e.*, application of an ELG that applies to the pertinent class of dischargers]....

(2) On a case-by-case basis under section 402(a)(1) of the Act [33 U.S.C. § 1342(a)(1)], to the extent that EPA-promulgated effluent limitations are inapplicable, [the "no ELG" case referred to in *Texas Oil*, above]....

(3) Through a combination of the methods in paragraphs (d)(1) and (2) of this section. Where promulgated effluent limitations guidelines only apply to certain aspects of the discharger's operation, or to certain pollutants, and other aspects or activities are subject to regulation on a case-by-case basis in order to carry out the provisions of the Act.

40 C.F.R. § 125.3(c)(1)–(3).[6]

In other words, where an ELG applies to the permit applicant's discharge, the permit writer, either EPA or the State (the Kentucky Cabinet's Division of Water), simply includes in the permit the technology-based effluent limits provided by the Guideline. If there is no such ELG, the permit writer (again either EPA or the State) must consider the same factors that EPA would consider in arriving at a

---

**6.** Subsection (3) of this section refers to "a combination of the methods in paragraphs (d)(1) and (2) of this section." The reference to "paragraphs (d)(1) and (2)" is surprising since a reference to the "methods" just defined in paragraphs (c)(1) and (2) seems most logical. The reference seems even more surprising when one turns to paragraphs (d)(1) and (2) and finds that rather than "methods" of imposing technology based treatment requirements in permits, they pertain to "factors" the permit writer must consider "[i]n setting case-by-case limitations pursuant to § 125.3(c)." In other words, the subsection (c)(3) reference to paragraphs (d)(1) and (2)

strongly suggests a misprint or typeset error. That impression becomes even stronger when reference is had to 44 Fed. Reg. 32,949 (1977), where § 125.3(c)(3) is rendered, as expected, as "through a combination of the methods in paragraphs (c)(1) and (2) of this subsection." (underlining added). The courts below and the parties have all tacitly agreed to read § 125.3(c)(3) in this manner. Because we conclude that paragraph (c)(1), not paragraph (c)(3), applies in this case, we will, without having to address any further the misprint question, adopt for the sake of discussing their arguments the parties' reading of § 125.3(c)(1)–(3).

Guideline and use his or her "best professional judgment" to arrive at a guideline-like limitation. In the case, finally, where an existing ELG applies to some part or aspect of the applicant's discharge, but the existing ELG leaves other parts or aspects of the discharge unaddressed, then the permit writer applies the Guideline to the extent possible, and employs the BPJ analysis to the extent necessary, to arrive at appropriate technology-based effluent limits.

■ As noted by the Court of Appeals' majority, this case boils down to the parties' disagreement over whether the 1982 Guideline "applies" to the specific toxic pollutants—mercury, arsenic, and selenium—of concern to the Alliance, and thus which "method of imposing technology-based treatment requirements" the permit writer should have employed. LG&E and the Cabinet maintain that the subject permit falls under a 40 C.F.R. § 125.3(c)(1) analysis, *i.e.*, the 1982 Guideline applies to the "category" of "discharger" to which LG&E belongs and the Guideline controls the permit. The Alliance insists that a 40 C.F.R. § 125.3(c)(3) analysis is required because "promulgated effluent limitations"—the 1982 Guideline—"only apply to certain aspects of the discharger's operation, or to certain pollutants, and other aspects or activities are subject to regulation on a case-by-case basis."

The 1982 ELG, as the panel majority observed, established for "new sources," which LG&E's facility was under the Act,

> performance standards and limits on the levels of pH, TSS [total suspended solids], oil, and grease in discharged wastewater.... The 1982 ELG did not set effluent limits for arsenic, mercury, or selenium. Rather, the EPA's final rule stated that thirty-four toxic pollutants, including these three metals, were 'excluded from national regulation because they are present in amounts too small to be effectively reduced by technologies known to the Administrator,' ... 47 Fed. Reg. 52,290, 52,303 (Nov. 19, 1982).

*Louisville Gas and Electric Co. v. Kentucky Waterways Alliance*, No. 2013–CA–001695–MR, at 11–12, 2015 WL 3427746 (Ky. Ct. App. May 29, 2015).

The circuit court and the Court of Appeals' majority acknowledged that the 1982 Guideline addressed, by its terms, "low volume waste sources," which are defined in the regulation to include "wastewaters from wet scrubber air pollution control systems." 47 Fed. Reg. 52,305. Because the Guideline did not limit the listed toxics in those low volume wastes, however, the lower courts concluded that the Guideline only applied "to certain pollutants" in those wastes, and thus brought into play 40 C.F.R. § 125.3(c)(3), which, as noted above, requires the permitter to apply Guideline limits to those aspects of a discharge the Guideline addresses, but for aspects not addressed, to arrive at suitable effluent limits through the exercise of "best professional judgment." In the view of the lower courts, the Division's permit writer ran afoul of that requirement by failing to establish suitable BAT limits for the three toxic chemicals of concern to the Alliance. Having considered applicable law, we must disagree.

Even though the 1982 Guideline does not provide a technology-based limit for the thirty-four toxic chemicals it lists, including the chemicals at issue here—mercury, arsenic, and selenium—the 1982 Guideline expressly addresses those chemicals in explaining why, in the Administrator's view, TBELs with respect to them were not then possible. The EPA's Guideline-issuing responsibility under the Act includes the duty to "identify ... the degree of effluent reduction attainable through the application of the best control

measures and practices." 33 U.S.C. § 1314(b)(2)(A). If the Administrator finds, as he did in the 1982 Guideline, that no meaningful reduction of a given pollutant is possible with current technology, then the lack of a TBEL for that pollutant does not mean that the unregulated pollutant was unaddressed by or outside the scope of the Guideline.

The Illinois Appellate Court reached the same conclusion in *Natural Resources Defense Council v. Pollution Control Bd.*, 394 Ill.Dec. 928, 37 N.E.3d 407 (Ill. App. Ct. 2015), when faced with the issue in a case challenging the discharge of mercury-containing effluent by a coal-fired steam electric generating facility referred to as the Havana facility. That court noted that the 1982 Guideline covered "even the smallest amount of 'low volume waste sources,'" with that term defined in a way that plainly encompassed the entire waste stream generated by the Havana facility. *Id.*, 394 Ill.Dec. 928, 37 N.E.3d at 413. The applicability of a national ELG, the 1982 Guideline, in that court's view meant that the Illinois EPA "was not required to adopt TBELs on a case-by-case basis for the Havana facility." *Id.* In further support of its decision, the Illinois court cited the EPA's most recent Permit Writer's Manual as follows:

As noted above, case-by-case TBELs are established in situations where EPA promulgated effluent guidelines are inapplicable. That includes situations such as the following:

* * *

When effluent guidelines are available for the industry category, but no effluent guidelines requirements are available for the pollutant of concern (e.g., a facility is regulated by the effluent guidelines for Pesticide Chemicals [Part 455] but discharges a pesticide that is not regulated by these effluent guidelines). The permit writer should make sure that the pollutant of concern is not already controlled by the effluent guidelines and was not considered by EPA when the Agency developed the effluent guidelines. *U.S. Environmental Protection Agency National Pollutant Discharge Elimination System (NPDES) Permit Writers' Manual*, § 5.2.3.2, at 5–45–5–46 (Sept. 2010) (2010 USEPA permit manual).

*Id.* 394 Ill.Dec. 928, 37 N.E.3d at 413–14.

Thus, the Illinois court concluded that the relevant question was whether the EPA had considered the toxic pollutant at issue, and because it had considered and addressed it (even if the agency had not set limits) then the permit writer was required "to refrain from imposing best-professional-judgment limitations and [must] instead use the applicable [1982] ELG." *Id.* 394 Ill.Dec. 928, 37 N.E.3d at 414.

Our own Kentucky Energy and Environment Cabinet adopts the same view of the federal regulation, noting further that it is unaware of any other court that has interpreted 40 C.F.R. 125.3(c), as the Court of Appeals did in this case, to require a state agency to apply case-by-case TBELs where there is an EPA-promulgated guideline that expressly applies to the category of discharger. Kentucky courts give substantial deference to an administrative agency's construction of applicable statutes and regulations as long as that interpretation is consistent with the statutory or regulatory language at issue. *Morgan v. Nat'l Res. & Environ. Prot. Cabinet*, 6 S.W.3d 833, 842 (Ky. Ct. App. 1999); *Hagan v. Farris*, 807 S.W.2d 488, 490 (Ky. 1991). Indeed, in the event of any ambiguity, "the courts grant deference to any permissible construction of that statute [or regulation] by the administrative agency charged with implementing it," regardless of whether the Court would reach

the same conclusion *de novo*. *Pub. Serv. Comm'n of Ky. v. Commonwealth*, 320 S.W.3d 660, 668 (Ky. 2010). The Cabinet's interpretation is certainly a reasonable one, and it is entitled to deference. The circuit court's and the appellate majority's contrary conclusion—requiring the permit writer to employ BPJ analysis to arrive at appropriate effluent limits—was erroneous.

The EPA's long delay in updating the 1982 Guideline to reflect advances in technology is admittedly troublesome. The Clean Water Act

> requires the EPA to review effluent limitations, and to revise them as appropriate, "at least every five years." 33 U.S.C. § 1311(d). The EPA also must annually "revise, if appropriate," the regulations setting forth ELGs. 33 U.S.C. § 1314(b).

*Defenders of Wildlife v. Jackson*, 284 F.R.D. 1, 3 (D.D.C. 2012). However, if the EPA allows a Guideline to grow obsolete, so that it no longer accurately reflects the technologies available, the remedy would seem to be against the EPA,[7] not, as the Alliance and the courts below would have it, against the permit writers. The permit writers are tasked with applying the Guidelines they are given, not with revising them, however justified revision might seem and however tempting shortcuts can be.

■ Finally, while the Alliance's petition for reconsideration of LG&E's permit was before the Cabinet's hearing officer, the Division's permit writer explained that while she was assessing LG&E's permit application she was aware of the growing concerns about toxic pollutants in the wastes of electricity generators, and she had reviewed descriptions of technologies for mitigating them used at other generating facilities or under study. She was also well aware, she both testified and averred, that the EPA was then studying the matter and was very likely to promulgate a new Guideline for steam electric generators in the near future. That pending regulatory change was a strong reason, in her view, to defer for a time the costly and drastic step of trying to fashion her own TBEL for mercury, arsenic, and selenium, even assuming that that was something she was authorized to do. Accordingly, the permit she drafted imposed the technology-based effluent limitations required by the 1982 Guideline, but also required LG&E to test its effluent periodically for mercury and for toxicity and to keep records of the results. Further, the permit provided that it would be reopened in two years for reassessment in light of any new technological or regulatory developments.

■ Endorsing the permit writer's approach, the hearing officer characterized it as an adequate exercise of a "best professional judgment" analysis. As the Alliance insists, and as LG&E and the Cabinet have conceded, the hearing officer's characterization was inaccurate. "Best professional judgment" is the standard required of permit issuers who actually go through the case-by-case procedure for setting a TBEL in the absence of an applicable Guideline. When that procedure is called for, state permitters, no less than the EPA, are *required* to adhere to the technology-based standards set out in § 1311(b)." *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 183 (D.C. Cir. 1988) (noting that "[s]tates issuing permits pur-

---

7. *See Defenders of Wildlife*, 284 F.R.D. at 3 (noting that in November 2010, environmental groups sued the EPA "challenging its 'fail[ure] to comply with its mandatory duty to … review … the ELGs for the Steam Elec-

tric Power Generating category.'" That suit resulted in a consent decree in which the EPA agreed to review its 1982 Guideline, the first step toward the new 2015 Guideline.).

suant to § 1342(b) stand in the shoes of the agency, and thus must similarly pay heed to § 1311(b)'s technology-based standards when exercising their BPJ").

Generally, furthermore, as the Alliance also insists, in the true absence of an applicable Guideline, permitters are obliged to engage in BPJ analysis in order to satisfy the Act's requirement of appropriate technology-based effluent limits. 33 U.S.C. § 1342(b); *Nat. Res. Def. Council v. EPA*, 863 F.2d 1420, 1424–25 (9th Cir. 1988) (discussing the BPJ process for establishing permit effluent limitations in the absence of an industry-wide Guideline). As the federal Court of Appeals for the Ninth Circuit noted in *NRDC*, however, circumstances may exist, such as in that case EPA's anticipated promulgation of a national Guideline, in which a permitter may defer the BPJ exercise so as to avoid issuing a permit not in keeping with national standards. *NRDC*, 863 F.2d at 1428 (explaining that because "there is a justifiable concern on EPA's part to have this permit conform to national standards based upon a broader economic data base ... the EPA was not arbitrary or capricious in declining to make an assessment of ... BAT on this record").

This, we believe, is what the hearing officer meant when he approved the "professional judgment" of the Division's permit writer, and we agree. In the circumstances of this case, as in *NRDC*, with EPA apparently poised to issue a new national Guideline, even had the permit writer been authorized to issue a BPJ-based limit on the toxic pollutants of concern (although in our view she was not), her decision to wait for a couple of years to see what the EPA was going to do would not have been an abuse of discretion. On this question, too, the circuit court and the appellate panel's majority missed the mark.

In closing, we note that the regulatory process culminated in November 2015 with the promulgation of the revised Guideline applicable to steam electric power plants. *See* 80 Fed. Reg. 67,838–01 (Nov. 3, 2015). The new rule was "issued" for purposes of judicial review on November 17, 2015, and was to become effective on January 4, 2016. In light of findings to the effect that "[s]team electric power plants contribute the greatest amount of all toxic pollutants discharged to surface waters by industrial categories regulated under the CWA," 80 Fed. Reg. at 67,838, as well as concerns that the existing steam electric ELGs, last revised in 1982, "do not adequately control the pollutants (toxic metals and other) discharged by this industry, nor do they reflect relevant process and technology advances that have occurred in the last 30–plus years," 80 Fed. Reg. at 67,840, the new regulation introduces a number of significant changes. Those changes include, for existing sources of direct discharges (such as LG&E's Trimble facility), BAT limitations—the new BAT being a combination of chemical and biological treatments, 80 Fed. Reg. at 67,850—for FGD wastewater that set numeric effluent limits on the discharge of mercury, arsenic, selenium and nitrate/nitrite. 80 Fed. Reg. at 67,841. Interestingly, the EPA decided expressly "not to establish a requirement that would direct permitting authorities to establish limitations for FGD wastewater using site-specific BPJ." 80 Fed. Reg. at 67,852. That approach was favored by no one, neither industry, state officials, nor environmental groups, and would, the EPA noted, "place an unnecessary burden on permitting authorities, including state and local agencies, to conduct a complex technical analysis that they may not have the resources or expertise to complete. BPJ permitting of FGD wastewater would also unnecessarily burden the regulated industry because of associated delays and un-

certainty with respect to permits." *Id.* Where the new BAT limitations are more stringent than previously established BPT (Best Practical Control Technology Currently Available) limitations (as with the FGD wastewater), the new "limitations do not apply until a date determined by the permitting authority that is as soon as possible beginning November 1, 2018, ... but that is also no later than December 31, 2023." 80 Fed. Reg. at 67,854.

## CONCLUSION

In sum, while the Franklin Circuit Court correctly determined that its jurisdiction to review the Alliance's challenge to LG&E's renewed Trimble County KPDES permit had been adequately invoked, both it and the Court of Appeals erred in concluding that the permit was invalid. In the face of the 1982 Guideline's express determination that TBELs for the toxic pollutants of concern to the Alliance were not possible, the renewed permit was not required to include best-professional-judgment-based TBELs for those pollutants. The Cabinet's determination that the LG&E permit should proceed under 40 C.F.R. § 125.3(c)(1), as opposed to (c)(3), was a reasonable interpretation of the regulation and merits our deference. Furthermore, while technology-based means of limiting the three pollutants at issue may have become available since 1982, the Cabinet's Division of Water permit writer did not abuse her discretion when she deferred any such BPJ assessment in reasonable anticipation of imminent EPA revision of the Guideline. Accordingly, we reverse the decision of the Court of Appeals and hereby reinstate the permit issued by the Cabinet to LG&E.

All sitting. All concur.